744 A.2d 1146

ARTHUR WILDONER, PLAINTIFF–RESPONDENT, v. THE BOR-
OUGH OF RAMSEY, RAMSEY POLICE DEPARTMENT, OFFI-
CER KANE ZUHONE AND OFFICER BRIAN O'DONAHUE,
DEFENDANTS–APPELLANTS, AND HELEN GANNON AND
MARGARET DIEFERT, DEFENDANTS.

Argued October 13, 1999—Decided January 31, 2000.

*Thomas A. Keenan,* argued the cause for appellants (*Harwood Lloyd,* attorneys; *Eileen·P. Kuzma,* on the brief).

*Thomas L. Ferro,* argued the cause for respondent.

*Lawrence S. Lustberg,* argued the cause for amicus curiâe, New Jersey Coalition for Battered Women (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Lustberg* and *Lori Outzs Borgen,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

Plaintiff, Arthur Wildoner, was arrested for domestic violence against his wife, Cecilia Wildoner, by Borough of Ramsey Police Officers Kane Zuhone and Brian O'Donahue. This appeal arises out of plaintiff's action against the Borough of Ramsey (the "Borough"), the Ramsey Police Department (the "Department") and Officers O'Donahue and Zuhone, under state common law and 42 *U.S.C.A.* Section 1983 ("Section 1983"), for false arrest, false imprisonment, mistreatment, and malicious prosecution.

The central issue in this appeal is what circumstances constitute probable cause, or would justify a reasonably objective police officer in believing in the existence of probable cause, to effectuate an arrest under the Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25–17 to –33 (the "Act" or "Domestic Violence Act"). Specifically, did police officers acting on a concerned citizen's report, supported by the officers' analysis of the totality of the circumstances, act reasonably when they arrested an alleged perpetrator even though the victim and the alleged perpetrator deny that an act of domestic violence occurred.

## I.

Plaintiff, seventy years old at the time of his arrest, resided with his wife in the Woodlands Senior Home, a senior citizens' complex in Ramsey. On September 15, 1993, plaintiff's neighbor, Helen Gannon, reported to the apartment complex's manager, Margaret Diefert, that she had heard plaintiff using loud and abusive language and that he was threatening to throw knives at his wife. Diefert called the police.

A short while later, Officers Zuhone and O'Donahue arrived at the complex in response to Diefert's complaint. The officers first spoke with Gannon and Diefert. At that time Gannon confirmed her initial report. The officers then proceeded to plaintiff's apartment, which Mrs. Wildoner allowed them to enter. The officers observed a knife on the kitchen floor and a red mark on Mrs. Wildoner's arm. The officers arrested plaintiff and wheeled him out of the apartment in a wheelchair, covered by a blanket. He was transported to the police station in an ambulance.

A criminal complaint charging simple assault pursuant to *N.J.S.A.* 2C:12–1(a) was signed by Officer Zuhone against plaintiff. Because Cecilia Wildoner refused to sign a domestic violence complaint against her husband, Officers O'Donahue and Zuhone applied to the Ramsey Municipal Court for a temporary restraining order ("TRO") pursuant to *N.J.S.A.* 2C:25–21 of the Domestic Violence Act. By order dated September 15, 1993, the Municipal Court granted a TRO restraining plaintiff from going back to his home, and ordered the Wildoners to appear for a formal hearing in the Superior Court. Plaintiff was released that same day to his son, Arthur Wildoner, Jr., a Garfield police officer, who was allowed to take his father home without having to post bail.

The next day, after hearing testimony from Mrs. Wildoner only, the Law Division vacated the TRO. On the order vacating the TRO, the court made a hand-written notation: "Testimony in Court. No Complaint filed by Plaintiff. Police improperly obtained TRO." The assault complaint filed in the municipal court was dismissed at the end of the State's case.

On December 8, 1993, plaintiff filed a timely Notice of Claim pursuant to *N.J.S.A.* 59:8–4. On September 14, 1995, plaintiff filed this action against the Borough, the Department, and Officers O'Donahue and Zuhone, alleging false arrest and imprisonment, mistreatment, and malicious prosecution, in violation of his federal constitutional and state common-law rights. He also sought compensatory and punitive damages. Both Gannon and Diefert initially were also named as defendants, but plaintiff executed stipulations dismissing them both.

Depositions were taken of the officers, the Wildoners and their son. The accounts of the parties differ on what occurred when the officers arrived at the Wildoners' apartment.

### A. *The Officers' Account*

According to the officers, Mrs. Wildoner informed the police that plaintiff had been drinking and that an argument had ensued between them because Mrs. Wildoner did not want her husband to drive. Consistent with Gannon's report, the officers observed a knife in plain view on the kitchen floor. They also saw a red mark on Mrs. Wildoner's arm that she stated her husband had caused. Mrs. Wildoner also informed the officers that there had been a pattern of abuse throughout the forty-eight years of the couple's marriage.

Plaintiff was then arrested for a domestic violence assault. The officers assisted plaintiff into a wheelchair and covered him with a blanket. Because plaintiff complained of dizziness, he was taken to the Ramsey Police Station in an ambulance. Plaintiff declined an offer from paramedics to examine him, however, indicating that he did not need medical attention. Plaintiff was charged with simple assault and released that same day to his son, Arthur Wildoner, Jr.

### B. *The Wildoners' Account*

Plaintiff concedes that Gannon made a report to police claiming that she had heard plaintiff being loud and abusive and threaten-

ing to throw a knife at his wife. According to Mrs. Wildoner's deposition (which was taken in her husband's presence), however, the couple had not been arguing that day. Instead, plaintiff was, at times, "talking loud" about their grandchildren and, later, he was angry and shouting because Gannon had telephoned three times that day out of concern for Mrs. Wildoner's safety. Gannon's third call was to let Mrs. Wildoner know that she had called the police.

When the police arrived, one officer told Mrs. Wildoner to wait in the bedroom; when the officer returned he indicated that they were going to arrest plaintiff. According to Mrs. Wildoner, the police had her husband's hands behind his back and he was saying, "You're hurting me, you're hurting me."

Mrs. Wildoner attempted to help her husband put on his pants. In attempting to do so, she bruised her arm on the edge of a table. At some point, Mrs. Wildoner gave up trying to get her husband's pants on and the police took her husband away in a wheelchair, clad only in a t-shirt and his underwear. Mrs. Wildoner denied having told police that her husband had been drinking, slapped her with a cane, verbally abused her, or thrown a knife at her. She admitted having told police that her husband was angry. She also conceded that a knife was in plain view, but said that it was on the table, not the floor. Finally, Mrs. Wildoner testified that her husband could not possibly have beaten her "because I'd run like hell."

Plaintiff, in his deposition, stated that when the police arrived, he was seated at the kitchen table tapping a knife on the table. He agreed that at one point it may have flown out of his hands and landed on the kitchen floor, but he stated that his wife was in the bedroom at that time. According to plaintiff, one of the officers said "we don't have nothing here," and was going to leave, but one officer then abruptly returned, said "I'm going to try something," read plaintiff his rights, and twisted his hands behind his back to handcuff him. Aside from trying to get his arms behind his back to handcuff him, plaintiff concedes that the police

did nothing else to him physically. Moreover, although plaintiff claims the police told him that he was "bluffing" about being unable to walk, he also concedes that the police did get him a wheelchair and did not try to force him to walk. An ambulance transported him to the police station.

Plaintiff, who was seventy years old, testified that he had been wounded in the knee in World War II and had never recovered the full use of his legs. For the last eight to nine years he had had trouble bending the knee and had developed arthritis in the other leg, making it difficult for him to walk. He testified that he needed a cane and it took him a long time to get out of a chair. According to plaintiff, he could not possibly have attacked his wife because "[s]he could give me a shove and that would be the end of it."

In March, 1997, Arthur Wildoner, Jr. was deposed by defendants' attorneys concerning his knowledge of the incident. Wildoner, Jr., a Garfield police officer for twenty-one years, testified that at the time of the September 1993 incident, his parents had resided at the Ramsey apartment for approximately one to two years. Prior to that time, they had resided in a private residence in Garfield for approximately twenty-one years. Wildoner, Jr. worked as a Garfield police officer for about the last nineteen of his parents' twenty-one years' residence in Garfield. During that time, Wildoner, Jr. testified, the Garfield police had been called to his parents' home in connection with domestic disturbances on approximately five occasions. Wildoner, Jr. believed that the altercations were verbal and that, to his knowledge, no physical assaults had been alleged, nor any domestic violence complaints filed, in connection with any of those incidents. According to Wildoner, Jr., the verbal altercations between his parents continued after they moved to Ramsey. The Wildoners' loud arguments had given rise to complaints by other tenants and the couple had been threatened with eviction.

Wildoner, Jr. also stated that, when asked what happened, plaintiff told him that "he had a fight with mommy and a couple of

other choice words out of his mouth and he said they arrested me." That same evening Wildoner, Jr. asked his mother what happened. She told him that "they were fighting, he is drinking, she took his keys away and ... he threw a knife at her."

Wildoner, Jr. testified that his mother had reported that plaintiff had "hit her a few times" over the years, but Wildoner, Jr. stated that he was not concerned about the altercations because his mother was in better physical condition and his father could not throw a knife "with any velocity or substance behind it." Asked whether he, in his experience responding to domestic violence complaints, would have arrested a "frail" elderly man such as his father who had reportedly assaulted a "woman that's basically strong and healthy," Wildoner, Jr. replied, "Yes. If the law states that there is a victim who claims she was assaulted with a knife that was thrown at her, whether the guy is frail or not, he was arrested for domestic violence."

## II.

Upon the completion of discovery, defendants filed a motion for summary judgment seeking dismissal of the Complaint. In support of that motion, as required by *Rule* 4:46–2, defendants provided a list of material undisputed facts, and plaintiff, in opposing the motion, indicated the facts he disputed:

1. On September 15, 1993, the Ramsey Police Department received a telephone call from Margaret Diefert, Manager of Woodlands Senior Homes.

2. On September 15, 1993, Plaintiff, Arthur Wildoner, Sr. and his wife, Cecilia Wildoner, resided at the Woodlands Senior Homes Complex in Apartment 300.

3. Helen Gannon, the Wildoners' neighbor in the complex, called Mrs. Diefert to report "that Plaintiff was threatening to throw knives at his wife and was loud and abusive."

4. Officers Kane Zuhone and Ryan [sic] O'Donahue of the Ramsey Police Department were dispatched to the Woodlands Senior Homes after receiving a call from Ms. Diefert regarding the domestic situation in the Wildoners' apartment.

5. Officers Zuhone and O'Donahue consulted Ms. Diefert and Ms. Gannon before investigating the Wildoners' residence.

6. Upon the officers' arrival, Mrs. Wildoner admitted the officers into her apartment and told them that Plaintiff had been drinking, and that she did not want him to drive the car. *Plaintiff denies.*

7. Officers Zuhone and O'Donahue observed a red mark on Mrs. Wildoner's arm.

8. When Mrs. Wildoner was questioned about the red mark on her arm, she pointed to Plaintiff and said, "He did it to me." *Plaintiff denies.*

9. Mrs. Wildoner reported that he husband had thrown a knife at her. *Plaintiff denies.*

10. Officers Zuhone and O'Donahue observed a knife on the kitchen floor of the Wildoners' apartment. *Plaintiff denies.*

11. After being placed under arrest, Plaintiff was wheeled out of the apartment in a wheelchair, covered by a blanket.

12. Complaining of dizziness, Plaintiff was driven to the Ramsey Police Station in an ambulance. *Plaintiff denies.*

13. A criminal complaint charging simple assault (*N.J.S.A.* 2C:12–1a) was signed by Officer Zuhone against Plaintiff Wildoner.

14. Cecilia Wildoner refused to sign a domestic violence complaint.

15. Ramsey Police Officers applied to the Municipal Court Judge for a Temporary Restraining Order. A TRO was issued for Mrs. Wildoner's protection.

16. Plaintiff was released into the custody of his son, Arthur Wildoner, Jr., a police officer of 21 years.

17. Mrs. Wildoner told her son that her husband threw a knife at her that evening. *Plaintiff denies.*

18. Plaintiff never mentioned his "treatment" by the Ramsey police to his son. *Plaintiff denies.*

The Law Division granted defendants' motion and dismissed plaintiff's complaint. The court found that the facts not in dispute—that the police had acted in response to a citizen's complaint, and that when they arrived at the apartment they observed, consistent with Gannon's report, a knife in plain view and a red mark on Mrs. Wildoner's arm—not only supported the officers' objective good faith but also established probable cause for them to believe that plaintiff had committed an offense. The court observed that Mrs. Wildoner's declining to sign a complaint did not preclude the officers' action; to the contrary, the court found that the Domestic Violence Act was specifically designed to protect victims in the not uncommon situation in which an alleged victim says "I don't want him out of the house." The court concluded that "[t]o deny police the right to protect citizens from injury, especially from those closest to them, would make a mockery, in my opinion, of the Domestic Violence Statute." Ac-

cordingly, the court held that defendants were immune from liability under Section 1983 and *N.J.S.A.* 59:2–1, 3–3, and 9–2(d).

Plaintiff appealed, and the Appellate Division reversed, in part, the dismissal of plaintiff's claims. 316 *N.J.Super.* 487, 720 *A.*2d 645 (1998). The Appellate Division concluded that

> plaintiff raised genuine issues of material facts necessary to determine whether there was probable cause for his arrest and whether defendants were protected by good faith immunity under § 1983. Because plaintiff's claims of false arrest and false imprisonment depend on whether there was probable cause for the arrest, it was error to dismiss those claims and the claim for malicious prosecution. We affirm the dismissal of the state-law claim for damages for pain and suffering against all defendants and affirm the dismissal of the claim for punitive damages and malicious prosecution against the Ramsey Police Department and the Borough of Ramsey.

> [*Id.* at 492–93, 720 *A.*2d 645.]

The Appellate Division held, however, that the punitive damages claims against the individual officers could go forward on remand. *Id.* at 508, 720 *A.*2d 645.

The Appellate Division based its conclusion that plaintiff submitted evidence sufficient to allow a jury reasonably to find that the police lacked probable cause to arrest plaintiff principally upon the Wildoners' denials that any act of domestic violence had occurred and the differing versions of the police investigation presented by defendants and the Wildoners. For example, although defendants maintain that Mrs. Wildoner initially told police that her husband was intoxicated and had attacked her, Mrs. Wildoner denies ever making those allegations. Although police contend that Mrs. Wildoner initially told police that her husband caused the red mark on her arm, Mrs. Wildoner denies making that statement and claims she sustained the red mark by hitting her arm on the table. Although police allege that they observed a knife on the kitchen floor upon their entry into the apartment and plaintiff concedes that there might have been a knife on the floor, Mrs. Wildoner denies that a knife was on the floor and plaintiff asserts that he accidentally dropped the knife while his wife was out of the room. *Id.* at 499–500, 720 *A.*2d 645. In addition, the Appellate Division found that "plaintiff's poor physical condition was a

circumstance which a reasonable police officer should have considered," noting that the Wildoners and their son all agreed that plaintiff is physically incapable of inflicting injury upon his wife. *Id.* at 500, 720 *A.*2d 645. Those factors, the court concluded, raised genuine issues of material fact regarding the existence of probable cause sufficient to preclude summary judgment.

We granted defendants' petition for certification. 158 *N.J.* 75, 726 *A.*2d 938 (1999).

## III.

This appeal arises out of plaintiff's action seeking damages under state common law and Section 1983 for false arrest, false imprisonment, mistreatment, and malicious prosecution. We first discuss plaintiff's Section 1983 claim.

### A. *Section 1983*

Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
>
> [42 *U.S.C.A.* § 1983]

To establish a valid claim, plaintiff must prove that defendants acted under color of state law and deprived him of a well-established federal constitutional or statutory right. There is no dispute that the rights asserted by plaintiff are clearly established for purposes of Section 1983 or that the officers acted under color of law.

Under Section 1983, even if probable cause does not exist in fact, defendants may be entitled to assert a defense of qualified immunity if they reasonably believed that probable cause existed. The Supreme Court set forth the defense of qualified (or good-faith) immunity and its purpose as follows:

[W]e conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.

[*Harlow v. Fitzgerald,* 457 *U.S.* 800, 817–18, 102 *S.Ct.* 2727, 2738, 73 *L.Ed.*2d 396, 410 (1982) (citations and footnote omitted).]

In *Malley v. Briggs,* 475 *U.S.* 335, 337, 106 *S.Ct.* 1092, 1094, 89 *L.Ed.*2d 271, 276 (1986), a case similar to the present case, the Supreme Court considered "the question of the degree of immunity accorded a defendant police officer in a damages action under 42 *U.S.C.* § 1983 when it is alleged that the officer caused the plaintiff[ ] to be unconstitutionally arrested ... [without] probable cause." The Court, concluding that an officer applying for a warrant is entitled to assert qualified but not absolute immunity, observed that the defense of qualified immunity

provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Under the Harlow standard ... an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue, but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

[*Id.* at 341, 106 *S.Ct.* at 1096, 89 *L.Ed.*2d at 278.]

In *Kirk v. City of Newark,* 109 *N.J.* 173, 536 *A.*2d 229 (1988), we adopted *Harlow*'s "objective reasonableness" standard for determining whether law enforcement officials are entitled to the qualified immunity defense in Section 1983 actions. In that case, we found that

a law enforcement official can defend a section 1983 claim by establishing either that he or she acted with probable cause, or even if probable cause did not exist, that a reasonable police officer could have believed in its existence.

[*Id.* at 184, 536 *A.*2d 229.]

We also recognized that the Supreme Court has interpreted Section 1983 "to limit the rights of plaintiffs and to encourage

disposition of the actions as a matter of law, at least when these actions arise out of an alleged unlawful arrest, search, or seizure by a law enforcement officer." *Id.* at 179, 536 *A.*2d 229. Qualified immunity "is an *immunity from suit* rather than a mere defense to liability" that is effectively lost if the case is allowed to go to trial. *Mitchell v. Forsyth,* 472 *U.S.* 511, 526, 105 *S.Ct.* 2806, 2815, 86 *L.Ed.*2d 411, 425 (1985); *see also Kirk, supra,* 109 *N.J.* at 182, 536 *A.*2d 229 (holding that in the future we expect that similar cases will be determined by motions for summary judgment). For that reason, a defendant's entitlement to qualified immunity is a question of law to be decided early in the proceedings as possible, preferably on a properly supported motion for summary judgment or dismissal.

### B. *N.J.S.A. 59:3–3 of the Tort Claims Act*

Plaintiff also claims damages under the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to –12–3. *N.J.S.A.* 59:3–3 states:

A public employee is not liable if he acts in good faith in the execution of enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment.

The same standard of objective reasonableness that applies in Section 1983 actions also governs questions of good faith arising under the Tort Claims Act, *N.J.S.A.* 59:9–3. *Lear v. Township of Piscataway,* 236 *N.J.Super.* 550, 553, 566 *A.*2d 557 (App.Div.1989); *Hayes v. Mercer County,* 217 *N.J.Super.* 614, 621–22, 526 *A.*2d 737 (App.Div.) (holding marked similarities between facts known about indicted man and facts known about plaintiff coupled with plaintiff's refusal to submit to photographic identification established objective reasonableness of investigator's initiating investigation against wrong man), *certif. denied,* 108 *N.J.* 643, 532 *A.*2d 226 (1987).

### C. *N.J.S.A. 2C:25–22 of the Domestic Violence Act*

In addition to the good-faith immunity provided by the Tort Claims Act, defendants also are shielded by the specific immunity provided under *N.J.S.A.* 2C:25–22 of the Domestic Violence Act.

Plaintiff's arrest was made pursuant to the Domestic Violence Act. Domestic violence remains a serious problem in our society. *Cesare v. Cesare,* 154 *N.J.* 394, 397, 713 *A.*2d 390 (1998). In *Cesare,* we outlined the legislative history of the Domestic Violence Act and confirmed New Jersey's strong policy against domestic violence. *Id.* at 398–400, 713 *A.*2d 390. *See N.J.S.A.* 2C:25–18; Preamble, *L.* 1994, *Joint Resolution No. 2* reprinted at *N.J.S.A.* 2C:25–17.

The purpose of the Domestic Violence Act is "to assure the victims of domestic violence the maximum protection from abuse the law can provide." *N.J.S.A.* 2C:25–18. The Legislature specifically addressed the need to counter prevailing societal views regarding acts of domestic violence. *Ibid.* The Legislature particularly sought to cure the reluctance on the part of police to arrest alleged perpetrators of domestic violence that had contributed to the underenforcement of the domestic violence laws. *Ibid.* Indeed, the legislative findings underlying the Domestic Violence Act assert:

> It is the intent of the Legislature to stress that the primary duty of a law enforcement officer when responding to a domestic violence call is to enforce the laws allegedly violated and to protect the victim.
>
> [*Ibid.*].

As part of the Act the Legislature encouraged the training of police and judicial personnel "in the procedures and enforcement of the Act, and about the social and psychological context in which domestic violence occurs." *Ibid.*

The Act also broadened the discretion of a police officer to arrest an alleged perpetrator, even when the victim did not corroborate the incident, provided that the officer had probable cause to believe the incident occurred. *N.J.S.A.* 2C:25–21(b). The purpose of this broadened authority to arrest was not to punish the perpetrator, but to protect the victim. *Carfagno v. Carfagno,* 288 *N.J.Super.* 424, 434, 672 *A.*2d 751 (Ch.Div.1995). With those provisions, the Legislature attempted to assure that more arrests would be made, and more victims protected, from domestic violence.

To ensure protection for law enforcement officers and others who in good faith report a possible incident of domestic violence, the Legislature enacted *N.J.S.A.* 2C:25–22, which provides:

> A law enforcement officer or a member of a domestic crisis team or any person who, in good faith, reports a possible incident of domestic violence to the police shall not be held liable in any civil action brought by any party for an arrest based on *probable cause, enforcement in good faith of a court order, or any other act or omission in good faith* under this act.[1]
>
> [*N.J.S.A.* 2C:25–22 (emphasis added).]

## IV.

Because probable cause is an absolute defense to Plaintiff's false arrest, false imprisonment, and malicious prosecution claims, and his Section 1983 claims, the central issue in this appeal is whether there was probable cause, or, alternatively, whether it was objectively reasonable for the officers to believe that probable cause existed at the time of plaintiff's arrest.

Probable cause exists if at the time of the arrest "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio,* 379 *U.S.* 89, 91, 85 *S.Ct.* 223, 225, 13 *L.Ed.*2d 142, 145 (1964), *see also State v. Waltz,* 61 *N.J.* 83, 87, 293 *A.*2d 167 (1972) (describing probable cause as a "well-grounded" suspicion that a crime has been or is being committed).

Although it eludes precise definition, probable cause "is not a technical concept but rather one having to do with 'the factual and practical considerations of every day life' upon which reasonable

---

[1] The version of this statute in effect in September 1993 did not contain the language "or any person who, in good faith, reports a possible incident of domestic violence to the police." Those words were added by *L.* 1994, *c.* 94, § 2, effective August 11, 1994. The clear intent of the amendment was to expand the immunity by enlarging the class of persons covered to include persons who report, in good faith, a possible incident of domestic violence to the police.

men, not constitutional lawyers, act." *Waltz, supra,* 61 *N.J.* at 87, 293 *A.*2d 167 (quoting *Brinegar v. United States,* 338 *U.S.* 160, 175, 69 *S.Ct.* 1302, 1310, 93 *L.Ed.* 1879, 1890 (1949)). Thus, "the common and specialized experience and work-a-day knowledge of police [officers] must be taken into account." *State v. Contursi,* 44 *N.J.* 422, 431, 209 *A.*2d 829 (1965). Moreover, "[a]bstract contemplation will not suffice because the decisions of police officers must be made on the spur of the moment and cannot be viewed fairly from the vantage point of twenty-twenty hindsight." *Sanducci v. City of Hoboken,* 315 *N.J.Super.* 475, 481, 719 *A.*2d 160 (1998). "The answer must instead be found 'in the tumult of the streets.'" *Ibid.* (quoting *State v. Gerardo,* 53 *N.J.* 261, 264, 250 *A.*2d 130 (1969)).

## V.

In applying those principles to this case, we recognize that in reviewing a summary judgment disposition, we must view the competent evidential materials presented in the light most favorable to the nonmoving party. *Brill v. Guardian Life Ins. Co.,* 142 *N.J.* 520, 523, 540, 666 *A.*2d 146 (1995); *R.* 4:46–2(c). "Although 'genuine' issues of material fact preclude the granting of summary judgment, *R.* 4:46–2, those that are 'of an insubstantial nature' do not." *Brill, supra,* 142 *N.J.* at 530, 666 *A.*2d 146 (quoting *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67, 75, 110 *A.*2d 24 (1954)).

Probable cause to arrest can be based on the statement of a witness or informant.

> Generally, some verification of an anonymous informant's disclosures of criminal activity, as well as a demonstration of his trustworthiness, are necessary in order to establish his credibility, so that such information may fairly and reasonably be assimilated as a proper basis for appropriate police action.
>
> [*Sanducci, supra,* 315 *N.J.Super.* at 482, 719 *A.*2d 160].

A report by a concerned citizen, however, generally has not been viewed with the same degree of suspicion that applies to a tip by a confidential informant. "Different considerations obtain ... when the informer is an ordinary citizen." *State v. Davis,* 104 *N.J.* 490,

506, 517 A.2d 859 (1986) (holding police entitled to rely as basis for investigatory stop on telephone call from member of Springfield First Aid Squad reporting that two individuals were "hanging around" closed gasoline service station at midnight and noting that officer "might well have been derelict in his duties had he not stopped and questioned the defendant").

> There is an assumption grounded in common experience that such a person [a concerned citizen], in reporting criminal activity, would be motivated by factors which are consistent with law enforcement goals. Such indicia of reliability are heightened still further when the citizen provides the police with a sworn statement, thus subjecting himself or herself to potential civil or criminal liability. Here the police were not dealing with a faceless member of the criminal milieu, but instead with an ordinary citizen who claimed to be the victim of a frightening crime. The police cannot be faulted for acting upon the information received.
>
> [*Sanducci, supra,* 315 *N.J.Super.* at 482, 719 *A.2d* 160.]

In *State v. Lakomy,* 126 *N.J.Super.* 430, 435, 315 *A.2d* 46 (App.Div.1974), the court explained why a "different rationale exists for establishing the reliability of named 'citizen-informers' as opposed to the traditional idea of unnamed police contacts or informers who usually themselves are criminals." Information given by the criminal informant is usually given in exchange for some "concession, payment or simply out of revenge against the subject," whereas an ordinary citizen acts with "an intent to aid the police in law enforcement because of his concern for society or for his own safety. He does not expect any gain or concession in exchange for his information." *Lakomy, supra,* 126 *N.J.Super.* at 435–36, 315 *A.2d* 46 (quoting *State v. Paszek,* 50 *Wis.*2d 619, 184 *N.W.*2d 836, 842–43 (1971)).

Under the circumstances of this case, the officers properly placed substantial reliance on Gannon's statement. Gannon did not phone in an anonymous tip; rather, she waited at the scene and confirmed her report to police, conduct that eventually led to her also being named as a defendant in this suit. There was no allegation that Gannon reported the incident out of any motivation other than concern for Mrs. Wildoner's safety. Moreover, because this arrest occurred "in a context where the reactive measures taken are for the limited purpose of neutralizing a dangerous

situation," *Lakomy, supra,* 126 *N.J.Super.* at 436, 315 *A.*2d 46, the police appropriately relied on the report as a factor in their decision to arrest.

That an officer may enjoy broad discretion in effecting an arrest to separate an alleged victim from an alleged perpetrator is illustrated by this Court's decision in *Kirk, supra,* 109 *N.J.* 173, 536 *A.*2d 229. The plaintiff in *Kirk* alleged that the defendant police detective had caused him to be arrested without probable cause in connection with the detective's investigation of the scalding of a three-year-old child. Kirk was arrested based on the Division of Youth and Family Service's investigation and a doctor's report that found the injuries to be "of 'questionable origin.'" *Id.* at 176, 536 *A.*2d 229. A month later, the detective spoke for the first time with the doctor and requested a more detailed report. The doctor informed the detective that the burns were accidental in nature, consistent with the plaintiff's initial written statement that the burns resulted from the breaking of a bathroom sink pipe. *Id.* at 177, 536 *A.*2d 229.

The Court in *Kirk* recognized that "[p]rior to filing the complaint, defendant made no attempt to interview either the child, the mother, Dr. Fuller or attending nurses, nor did she visit plaintiff's apartment or inquire whether photographs had been taken." *Id.* at 187, 536 *A.*2d 229. Nevertheless, the Court rejected the plaintiff's claim that Kirk was unreasonable in failing to investigate further or exercise due diligence. In so holding, the Court was "mindful ... that the investigation focused on the possibility of the scalding of a three-year-old child by a man living with the child's mother." *Ibid.* Under those circumstances, the Court concluded, the investigator had been objectively reasonable in promptly effecting the plaintiff's arrest.

Similarly, the arrest in this case was effected for the principal purpose of removing the alleged perpetrator from the victim's presence and to allow the parties time to cool off. It is well documented that, for a number of reasons, victims of domestic violence often do not report their abuse to law enforcement

officers. Many victims deny the abuse when questioned. According to estimates from National Crime Victimization Survey data, only fifty-six percent of battering incidents are reported to police. *Understanding Violence Against Women* 117 (Nancy A. Crowell & Ann W. Burgess, eds., 1996). Other research suggests that the reporting rate is even lower, and that as few as seven to fourteen percent of battering incidents are reported. *Ibid. See also* American Medical Association, *When Someone You Love Hurts You,* 280 *JAMA* 488 (1998) (estimating that as few as five percent of battered women are identified and treated by emergency department staff). Accounts of concerned citizens—often neighbors—who have seen or heard domestic violence nearby, and who report it to the police, are therefore a crucial tool in combating domestic violence.

Courts, too, have recognized that victims of domestic violence do not often report their abuse to law enforcement agencies. Indeed, this Court has noted "the high incidence of unreported abuse [and that] . . . the FBI and other law enforcement experts believe that wife abuse is the most unreported crime in the United States." *State v. Kelly,* 97 *N.J.* 178, 191, 478 *A.*2d 364 (1984). *See also Tierney v. Davidson,* 133 *F.*3d 189, 198–99 (2d Cir.1998) (finding police officers had acted reasonably in conducting limited search of premises of alleged domestic violence incident even though victim's statements suggested that she did not want police to pursue their investigation, the court finding that victim's statements were contradicted by neighbors' independent reports of dispute and that victim's statements were self-contradictory); *United States v. Bartelho,* 71 *F.*3d 436, 442 (1st Cir.1995) (recognizing that "the police were not required to take [the victim's] statements at face value, given her demeanor, their training regarding domestic violence, and [a neighbor's] report."). *See, e.g.,* Lawrence W. Sherman, *Policing Domestic Violence* 226–230 (1992) (discussing role of neighbors in reporting and countering domestic violence in chronic cases).

We find that the failure of the victim and the alleged perpetrator to corroborate the allegations did not create a material issue of fact defeating probable cause. In certain cases, lack of corroboration can defeat the reliability of an informant's tip as a basis for probable cause. In the totality of circumstances here, however, Gannon's report was sufficient. She was plaintiff's neighbor who heard plaintiff yelling and threatening to throw knives at his wife, and she reported those specific details directly to the police. Moreover, although plaintiff and his wife did not corroborate Gannon's report to the police, the police were able to corroborate adequately the details of the report through their independent investigation. It is undisputed that when the police were at the apartment, they saw a knife in plain view and a red mark on Mrs. Wildoner's arm. Combined with Gannon's report, the officers had, at a minimum, an objectively reasonable belief in the existence of probable cause. That the police acted in good faith is underscored by the fact that, unlike in *Kirk*, where the plaintiff remained incarcerated for four days until bail was posted, plaintiff was merely held until his son arrived to take him home, with no bail having been imposed.

We find little merit in plaintiff's arguments that his physical condition precluded his being arrested because his wife, being in better physical condition, could have gotten away or physically resisted him before he inflicted any serious injury. As this Court has recognized, women in abusive situations do not always take measures to protect themselves, even when those measures appear to be self-evident and readily available. *See Kelly, supra*, 97 *N.J.* at 187, 478 *A.*2d 364 (recognizing admissibility of battered women's syndrome evidence). Moreover, the Wildoners have been married since 1945, and a pattern of spousal abuse could have been well entrenched by the time of this incident. Although the police officers did not know that at the time of the arrest, the deposition of Wildoner, Jr. confirms the history of abuse.

"Perpetrators of domestic violence can be found in all age, racial, socioeconomic, educational, occupational, and religious

groups.... They do not fit into any specific personality diagnosis." The Maryland Institute for Continuing Professional Education of Lawyers, Inc., *Domestic Violence Training Manual* Chap. I, § III. A. 1. (1995). As one doctor who has counseled hundreds of batterers has said: "We just can't tell the perpetrators by looking at them." Donald G. Dutton with Susan K. Golant, *The Batterer* 5 (1995). The simple fact of plaintiff's physical condition thus does not indicate that he could not commit an act of domestic violence. Nor does his age. In one research study, the battered women interviewed ranged in age from seventeen to seventy-six, while the batterers ranged from sixteen to seventy-six. Lenore E. Walker, *The Battered Woman* 31, 36 (1979). Indeed, in 1997, there were 897 domestic violence assaults reported in New Jersey against elderly individuals 60 years of age or over. New Jersey Department of Law and Public Safety, *Fifteenth Annual Domestic Violence Offense Report* 11 (1997). Of the 897 victims, 264 were assaulted by their spouses, and in 72% of these assaults, the victim was the wife. *Id.* There were also 268 reported cases of harassment by a spouse and, 69% of the time, the wife was the victim. *Id.*

A factor crucial to determining whether the officers reasonably believed that they had probable cause here is the underlying incident of domestic violence. As a result of the Domestic Violence Act, police officers have received training in the procedures and enforcement of the Act in order to further the Legislature's intention to "communicate the attitude that violent behavior may not be excused or tolerated." *N.J.S.A.* 2C:25–18. *See also N.J.S.A.* 2C:25–20 (mandating domestic violence training for police). In determining whether they have probable cause to arrest perpetrators of domestic violence, police must be able to rely on their training and knowledge of domestic violence, including the unwillingness of many victims to tell them what has happened, if the Act's goals are to be served. *See Sanducci, supra,* 315 *N.J.Super.* at 481, 719 *A.*2d 160 (noting that "the common and specialized experience and work-a-day knowledge of police [officers] must be taken into account" in determining whether police

had probable cause) (quoting *Contursi, supra,* 44 *N.J.* at 431, 209 *A.*2d 829). The decision by police to arrest plaintiff was a valid judgment call that was consistent with the "no tolerance" policy of the Legislature regarding incidents of domestic violence.

Indeed, if probable cause to arrest cannot be based upon the reliable report of a concerned citizen, as supported by an officer's review of the totality of the circumstances, then law enforcement officers' willingness to make such arrests may be chilled by fear of civil liability for their actions. Such a chilling effect would not further the goals of the Domestic Violence Act. The Act is remedial in nature, and "is to be liberally construed to achieve its salutary purposes." *Cesare, supra,* 154 *N.J.* at 400, 713 *A.*2d 390. A broad interpretation of the Act better conforms to the public policy against domestic violence and is in accordance with New Jersey's place "in the forefront of states that have sought to curb domestic violence." *Brennan v. Orban,* 145 *N.J.* 282, 299, 678 *A.*2d 667 (1996).

## VI.

Given the dynamics of domestic violence and the frequency with which victims themselves do not reach out to the police for assistance, it is critical that law enforcement officers be able to rely on concerned citizens' reports of domestic violence, as verified by a review of the totality of the circumstances, in order to arrest an alleged abuser. Certainly, an officer should consider the statement of a victim when reviewing the totality of the circumstances. However, where the officers investigating an alleged incident of domestic violence observe a weapon at the scene and an injury to the victim, and where statements other than that of the victim support a belief that a domestic violence incident occurred, the law enforcement officer could reasonably conclude that there is probable cause to arrest the alleged batterer.

We reverse the judgment of the Appellate Division and reinstate the order of the trial court dismissing the complaint.

*For reversal and reinstatement*—Chief Justice PORITZ, and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7.

*Opposed*—None.