# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0987-20

V.P.W.,[1]

    Plaintiff-Respondent,

v.

Z.A.K.,

    Defendant-Appellant.

_____

        Submitted December 1, 2021 – Decided January 21, 2022

        Before Judges Gooden Brown and Gummer.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FV-11-1141-20.

        Felsenfeld and Clopton, PC, attorneys for appellant (Howard L. Felsenfeld, on the brief).

        Respondent has not filed a brief.

PER CURIAM

---

[1] We use initials to protect the confidentiality of the victim. R. 1:38-3(d)(10).

Defendant appeals from a November 5, 2020 final restraining order (FRO) entered against him in favor of plaintiff, his former girlfriend, pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

Plaintiff and defendant were in a dating relationship for approximately six months while they were both students at Rider University before the issues underlying this appeal arose. Although plaintiff maintained a dormitory room on campus, she moved in with defendant in his nearby off-campus apartment in October 2019, two months into the relationship. By all accounts, the relationship was tumultuous. Between October and December 2019, the parties acknowledged "[defendant] tried breaking up with [plaintiff]" on four occasions but each time the parties eventually reconciled.

The genesis of the dispute that precipitated plaintiff's filing of the February 23, 2020 domestic violence complaint at issue in this appeal arose during a February 17, 2020 argument. In the complaint alleging the predicate act of harassment, plaintiff asserted that during the argument, defendant "threw [all her belongings] down the steps of his apartment," "pushed [her] onto the bed," and "continued yelling at her" before falling asleep. When he awoke the following morning, "[d]efendant started walking around [his] apartment stating

A-0987-20

that he was going to take his knife and start killing Rider students, . . . the President of Rider University," and plaintiff's "family." Plaintiff reported no prior history of domestic violence and sought a temporary restraining order (TRO).

On March 2, 2020, plaintiff amended the complaint, adding that at approximately 9:30 p.m. on February 22, 2020, defendant told her to "pack her belongings," called her derogatory names like "evil bitch," drove her to her dorm in a reckless manner, and, upon arrival, "pushed [her] out of the car." In the amended complaint, in addition to harassment, plaintiff asserted defendant had committed the predicate acts of assault and terroristic threats and reported a prior history of domestic violence consisting of defendant manipulating her, "push[ing her] onto the floor, grabb[ing] her mouth in an aggressive manner, . . . and spit[ting] in her face."

During a one-day FRO hearing conducted on November 5, 2020, both parties were represented by counsel and both parties testified. Plaintiff testified that during the peak of the February 17, 2020 argument, defendant "got aggressive and pushed" her "onto his bed." According to plaintiff, defendant "smothered [her] with his hand and covered [her] nose and mouth to the point where [she] couldn't breathe." He also "kick[ed her,]" "spit in [her] face,"

A-0987-20

"push[ed her] belongings down the stairs of his apartment," and then demanded she "clean it up." Plaintiff further testified that when she "rais[ed her] voice" in an attempt to alert neighbors, defendant told her to "keep quiet, so that the neighbors [did not] call the police on him." Plaintiff stated defendant eventually calmed down and she "stayed that night" because she "was afraid to leave." The following morning when she awoke, defendant "was pacing around his apartment" stating "he wanted to seek revenge on the students of Rider and he was going to kill [plaintiff], [her] family, [her] friends, and [Rider University] students, as well as the president of Rider." Plaintiff testified defendant "got his knife and . . . was about to leave the apartment," when she "stopped him" and "persuaded him not to [leave]."[2]

Plaintiff stayed with defendant for an additional week when the second incident occurred on February 22, 2020. On that date, plaintiff and defendant planned to attend an "off[-]campus party" to celebrate plaintiff's successful audition for a dance company. While she was listening to music and getting ready for the party, defendant asked her "why [she] was dressed like that, why [she] was enjoying [her]self, and why [she] was so happy." Defendant "then

---

[2] On cross-examination, plaintiff acknowledged that some events occurred at night, presumably on February 16, and some events occurred the morning of February 17.

A-0987-20

stormed into his . . . room" and "locked [plaintiff] out of the room." Plaintiff "texted [defendant] asking what was wrong and [asking] how [she could] help." A few minutes later, defendant "let[] [plaintiff] into the room" and told her "that he did not want to go to the party with [her] because [she] was an embarrassment and [she] had caused him to lose all of his relationships on campus." He then "pushed [her] out of his room."

According to plaintiff, a few moments later, defendant "storm[ed] out of the . . . room and [told her] to pack all [her] things" because the relationship was over and "he was go[ing to] take [her] to [her] dorm room." After they got into his car, defendant drove erratically and recklessly, "screaming at [plaintiff,] . . . calling [her] an 'evil bitch,' saying how horrible . . . a person [she was and] how [she was] ungrateful for him." When they arrived at her dorm, plaintiff remained in the car for a few minutes and "kept asking [defendant] what was wrong" because she "wanted closure" and wanted to understand "why [defendant] was doing what he was doing." Instead of responding to her questions, defendant "shoved [her] out of the car," causing her to "stumble[] onto the concrete" as he "sped off."

Plaintiff testified that later that evening, she and defendant unwittingly attended the same party. Plaintiff observed defendant and a friend "in the corner

5

of the room giving [her] a glare." After defendant and his friend "left the party," plaintiff "wait[ed]" to "make sure" defendant was "completely gone" before leaving the party. Plaintiff explained she was afraid "something would happen to [her] in [her] dorm room" so she decided to "stay[] in [her] friend['s] . . . room that night" since defendant knew where she lived.

That night, the parties exchanged text messages regarding the break-up. Plaintiff testified defendant sent her harassing texts stating she was a "horrible human being," she "went to the party and apparently cheated on [him,]" and "how disgusting [she] looked" at the party. The following morning, February 23, 2020, plaintiff went to the Lawrenceville police station and Rider's public safety department and gave a statement about "everything that[] [had] happened." She also filed the domestic violence complaint and sought a TRO.

Plaintiff explained she did not report the incidents "right away" because defendant was "unpredictable" and she "was in fear of [her] safety." She said she moved back into his apartment after each of the earlier break-ups "[b]ecause he manipulated [her]" into "believe[ing] that he cared for [her]." Nonetheless, she was "in fear of what [defendant] was capable of doing to [her] and what . . .

6

he would do to [her] friends or [her] family or anybody in the area."[3]  She testified she is "consistently . . . look[ing] . . . around [her] when [she] go[es] out in public" because she is "afraid that [defendant] might be there and come after [her]."  She explained she finally went to the authorities on February 23 because "that's when all the violence mostly accumulated[,] and it was enough . . . of [her] staying quiet and not telling anybody anything."  She felt she "needed to stand up for [her]self and for [her] safety" as well as the safety of her "family and . . . friends."

Defendant's version of events differed markedly from plaintiff's.  He denied pushing, striking, or smothering plaintiff or throwing her belongings down the stairs on February 17.  He also denied arming himself with a knife or making threats against plaintiff, her family, her friends, or Rider University's faculty and students.  Instead, defendant stated plaintiff "pushed [him] onto the bed," and was screaming at him.  He admitted asking her to "keep it down" because he was concerned the neighbors would call the police.  According to defendant, plaintiff eventually "f[e]ll asleep" as was her pattern whenever she would "flip out" in that fashion.

---

[3] Plaintiff testified that on an earlier occasion, defendant "told [her] that there [were] firearms in his family home."

A-0987-20

Regarding the second incident on February 22, defendant testified that while plaintiff was getting ready for the party, she was "getting really . . . upset," and "feeling insecure about th[e] dress she was wearing." He explained he made a comment that she misinterpreted and things got "heated" between them. He testified "she was manic," and her emotions that day were running from "extremely happy" to "extremely mad." Defendant admitted telling plaintiff during the heated exchange that he was "embarrassed by her and that she [was] disgusting to [him]." He stated it was at that point that he "officially ended the relationship."

Defendant testified after plaintiff's belongings were packed up, he drove her back to her dorm. He claimed she was "hitting [him] the entire . . . r[ide] there" and she tried to take control of the wheel. Upon arrival, they sat in the car for approximately "[twenty] minutes" because plaintiff "wouldn't get out" even though the car "door was open the entire time." Defendant believed plaintiff refused to leave the car because "she felt . . . that moment was her . . . last chance to . . . convince [him]." When plaintiff eventually exited the vehicle "on her own," he left without incident.

Defendant admitted attending the party that evening and exchanging text messages about the break-up. Defendant described the relationship as a

A-0987-20

"nightmare" and "dangerous" because plaintiff constantly had "outburst[s]" and he had to "walk on eggshells." Defendant claimed he "was beaten for months on end." He indicated that "on countless occasions [plaintiff] would throw . . . things at [him] and near the end of [their] relationship she started to slap [him] . . . [with] close[d] fists and . . . hit [him] in much more direct ways." Defendant stated he "would not call the police on her" because he was "not about to ruin her career in life." He indicated he endured the onslaughts because he "loved her" and still loved her "distantly."

In contrast, plaintiff denied being violent towards defendant. She acknowledged going to the doctor at defendant's behest because "he made [her] believe" she "had . . . mental issues." However, according to plaintiff, she was "misdiagnosed" and prescribed "Prozac for anxiety" which "did not work." Defendant acknowledged driving plaintiff to the doctor and claimed plaintiff was diagnosed with "bipolar disorder" but refused to take the prescribed medication. Defendant also admitted that when he was about seventeen years old, he "was diagnosed with bipolar disorder and . . . spent . . . the next three or four years while [he] was . . . getting ready for college . . . figuring [himself] out." However, he denied that his illness had caused any problems in the relationship.

9

Following summations, the trial judge rendered an oral decision and determined the entry of an FRO was justified. The judge was satisfied the evidence met both prongs of Silver v. Silver, 387 N.J. Super. 112, 125-26 (App. Div. 2006), delineating the two-part test for granting an FRO under the PDVA. First, the judge found jurisdiction under the PDVA predicated on the parties' dating relationship and the fact that "[plaintiff] resided with . . . [d]efendant for significant periods of time."[4] Next, the judge acknowledged "the record unquestionably established that there [was] an extremely tumultuous dysfunctional relationship between two very young college students," and the entire case hinged on the credibility of one party over the other.

After carefully evaluating the testimony of both parties, the judge found plaintiff's testimony "believable," "sincere," and "credible" based on her "candor" and "demeanor." The judge stated while plaintiff "appeared upset," she "demonstrated a level of consistency"[5] and "appeared to be even tempered." In contrast, while defendant "in general . . . appeared to be a credible young man," the judge found his "demeanor was somewhat difficult and he appeared

[4] Defendant does not dispute this determination. See N.J.S.A. 2C:25-19(d) (demarcating persons protected under the PDVA).

[5] The judge also compared plaintiff's trial testimony with her sworn statements in the domestic violence complaint.

A-0987-20

to become agitated during . . . his testimony." Further, he was "somewhat controlling" and "appeared to . . . ha[ve] formulated an approach to testifying and to communicating" that was "at variance with . . . [p]laintiff."

After crediting plaintiff's version of events over defendant's, the judge determined "there [was] no question . . . that the standard of proof . . . ha[d] been met." Based on plaintiff's testimony, the judge made detailed factual findings supporting his determination that defendant had committed the predicate acts of assault, N.J.S.A. 2C:12-1, terroristic threats, N.J.S.A. 2C:12-3, and harassment, N.J.S.A. 2C:33–4. The judge methodically recounted the two incidents: "[o]ne occurring either in the late night . . . or early morning hours" of February 16 and 17, 2020, and "the second incident [occurring] on February 22[], 2020."

Further, the judge concluded restraints were necessary to protect plaintiff from future acts of domestic violence. In that regard, the judge was "convinced that [plaintiff] . . . [was] sincerely fearful" of defendant and her "fear [did] not appear to be feigned or in any way made up." The judge addressed defense counsel questioning why plaintiff did not leave or alert the authorities until the February 22 incident along with the related implication that her report was prompted by revenge over the break-up rather than concern for her safety. The judge concluded that plaintiff's conduct "while not particularly logical in a

11

sense, is not inconsistent with the way an individual who has been battered [or] . . . subject[ed] to this cycle of violence reacts to certain situations."

In this ensuing one-sided appeal, defendant argues the judge erred in several respects. He contends the judge "made specific findings that both . . . [p]laintiff and [d]efendant were credible witnesses even though the testimony of the parties were in direct contradiction to one another," and plaintiff's "court testimony . . . conflict[ed] with her sworn statements made in both the initial domestic violence complaint as well as the amended domestic violence complaint." Further, defendant asserts "[t]here were no findings or adequate discussion on the record . . . as to why the court made th[e] conclusionary determination as to credibility" since plaintiff's "claims as to the predicate acts" lacked "any corroboration whatsoever." As such, defendant posits the judge's "determination that . . . [p]laintiff had sustained her burden by a preponderance of the evidence is against the weight of the testimony adduced at trial" and "[p]laintiff failed to show the necessity of a[n] [FRO] for protection."

Our limited scope of review of a trial court's findings of fact is well established. "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise

A-0987-20

between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

Consequently, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). To be sure, we will not disturb a trial court's factual findings unless "'they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). We do not, however, accord such deference to the court's legal conclusions, which we review de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The entry of an FRO under the PDVA requires the trial court to make certain findings pursuant to a two-step analysis delineated in Silver, 387 N.J. Super. at 125-27. Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125 (citing

13

N.J.S.A. 2C:25-29(a)).  Harassment, assault, and terroristic threats are among the predicate acts included in N.J.S.A. 2C:25-19(a).  See N.J.S.A. 2C:19(a)(2) to (3), (13).

A person commits harassment "if, with purpose to harass another," he:  (a) "[m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;" (b) "[s]ubjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so;" or (c) "[e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person."  N.J.S.A. 2C:33-4(a) to (c).

A person commits assault "if the person:  (1) [a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or (2) [n]egligently causes bodily injury to another with a deadly weapon; or (3) [a]ttempts by physical menace to put another in fear of imminent serious bodily injury."  N.J.S.A. 2C:12-1(a)(1) to (3).  A person commits terroristic threats "if he threatens to commit any crime of violence with the purpose to terrorize another" or "if he threatens to kill another with the purpose to put him in imminent fear of death under circumstances reasonably causing the victim to

14

believe the immediacy of the threat and the likelihood that it will be carried out." N.J.S.A. 2C:12-3(a) to (b).

If the court finds the defendant committed a predicate act of domestic violence, the court must then determine whether it "should enter a restraining order that provides protection for the victim." Silver, 387 N.J. Super. at 126. In those cases where "the risk of harm is so great," J.D. 207 N.J. at 488, the second inquiry "is most often perfunctory and self-evident," Silver, 387 N.J. Super. at 127. However, in all cases, "the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to . . . (6), to protect the victim from an immediate danger or to prevent further abuse." Ibid. Those factors include but are not limited to: "[t]he previous history of domestic violence between the [parties], including threats, harassment and physical abuse;" "[t]he existence of immediate danger to person or property;" and "[t]he best interests of the victim and any child." N.J.S.A. 2C:25-29(a)(1) to (2), (4).

Applying these standards, we are satisfied the judge's issuance of an FRO is supported by substantial credible evidence in the record. The judge's credibility findings — adopting plaintiff's narrative of the events over that of defendant's — are entitled to deference on appeal, and we are unpersuaded by

15

defendant's criticisms of the judge's assessment in that regard. Indeed, several cases in which our courts have explained the victim's counter-intuitive delay, or outright failure to seek help, as endemic of the dynamics of any abusive relationship support the judge's assessment. See, e.g., Wildoner v. Borough of Ramsey, 162 N.J. 375, 392-93 (2000) ("It is well documented that, for a number of reasons, victims of domestic violence often do not report their abuse to law enforcement officers."); Tribuzio v. Roder, 356 N.J. Super. 590, 597 (App. Div. 2003) ("Indeed, it is somewhat typical in domestic abuse situations that a victim will try to avoid signing a complaint under the Act, hoping the perpetrator will just leave her alone, and then, after a cumulation of incidents, the victim takes the necessary legal action.").

Based on our review of the record, we are convinced there is sufficient credible evidence to support the determination that defendant committed the predicate acts to satisfy the first Silver prong. 387 N.J. Super. at 125. Plaintiff's testimony that defendant smothered, shoved, and kicked her during the February 17 argument and shoved her out of the car on February 22 was sufficient to establish simple assault. See Capell v. Capell, 358 N.J. Super. 107, 111 (App. Div. 2003) (holding that evidence of a husband shoving his wife into the bathroom counter during an argument was sufficient to establish simple assault).

A-0987-20

Plaintiff's testimony also established terroristic threats by virtue of defendant's threats to kill her and others while arming himself with a knife. See Cesare, 154 N.J. at 402-03 (explaining that "[p]roof of terroristic threats must be measured by an objective standard" and "under an objective standard, courts should not consider the victim's actual fear," but "must still consider a plaintiff's individual circumstances and background in determining whether a reasonable person in that situation would have believed the defendant's threat").

Additionally, the totality of the circumstances demonstrated that defendant's communications, which included coarse language, his actions in subjecting plaintiff to striking, kicking, and shoving, and his course of alarming conduct, particularly the text messages, were engaged in with the purpose to harass plaintiff. See State v. Hoffman, 149 N.J. 564, 577, 585 (1997) (explaining that in determining whether a defendant's conduct constitutes harassment, a judge may use "[c]ommon sense and experience" and "[t]he incidents under scrutiny must be examined in light of the totality of the circumstances"); C.M.F. v. R.G.F., 418 N.J. Super. 396, 404 (App. Div. 2011) (noting that "the very nature of the verbal attack, the manner of its delivery and the attendant circumstances" may "strongly suggest a purpose to harass"); Pazienza v. Camarata, 381 N.J. Super. 173, 183-184 (App. Div. 2005)

(explaining text messages sent from defendant to plaintiff "when viewed in the context of defendant's prior conduct towards plaintiff, was likely to cause plaintiff annoyance," and the "purpose to harass on defendant's part [was] easily inferred").

Finally, the evidence established that an FRO was required to protect plaintiff and prevent further acts of domestic violence, satisfying the second Silver prong. 387 N.J. Super. at 126-27. Critically, the judge was "convinced" that an FRO was warranted based on plaintiff's genuine fear of defendant. "Because the entire case was premised on disputed testimony and the credibility of witnesses," we are bound to defer to the judge's findings in that regard as they are based on sufficient, credible evidence in the record. Cesare, 154 N.J. at 416. Thus, we discern no legal or factual basis to question the outcome of this case.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18

A-0987-20