744 A.2d 1158

SONDRA CONNOR, PLAINTIFF–APPELLANT, v. PENELOPE POW-ELL AND JOHN DOE, (FICTITIOUS NAME), DEFENDANTS, AND NEWARK POLICE DEPARTMENT, OFFICER FOSTER BADGLEY, SGT. JOHN CANTALUPO, OFFICER JAMES BIRC-SAK AND ACT. LT. RICHARD MANDRIOTA, DEFENDANTS–RESPONDENTS.

Argued November 9, 1999—Decided January 31, 2000.

*Joel I. Rachmiel,* argued the cause for appellant.

*John C. Pidgeon,* First Assistant Corporation Counsel, argued the cause for respondents (*Michelle Hollar–Gregory,* Corporation Counsel, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the trial court's involuntary dismissal of plaintiff, Sondra Connor's, claims against four City of Newark police officers for false arrest, false accusation, false imprisonment, and malicious prosecution under 42 *U.S.C.A.* § 1983 ("Section 1983"). The central issue on appeal is whether there was probable cause, or alternatively, whether it was objectively reasonable for the police officers to believe that probable cause existed to arrest plaintiff and to issue a complaint-warrant charging her with aggravated assault and possession of a weapon for an unlawful purpose, and a separate complaint-summons for possession of a dangerous weapon.

## I.

Connor is the executive director of the Foundation for Servicing Adults with Learning Disabilities of New Jersey. In that capacity, she supervises the operation of a bingo game conducted in a hall located in Newark. On Saturday, May 14, 1994, sometime around noon, Connor was preparing for the day's bingo activities when she observed Penelope Powell engaging in illegal gambling in the bingo hall. At that time, there were about fifty people in the bingo hall. Connor, who was approximately fifty feet from Powell, warned her to stop the illegal activity. The two women exchanged strong words in raised voices. According to plaintiff and several other witnesses, Powell responded by attacking Connor with a wooden chair, and hitting her several times on the head, shoulders, arms, and hands. Connor raised her arms above her head to protect herself. Powell's final blow struck a bingo volunteer. Connor testified that she had nothing in her hands at the time of the attack, and none of the witnesses who testified at trial saw any object in Connor's hands.

Connor sought the assistance of James Bircsak, an off-duty Newark police officer who witnessed the incident. According to plaintiff, Officer Bircsak was periodically employed by the Foundation to provide security. Officer Bircsak, however, denied ever working for the bingo hall.

Nevertheless, Officer Bircsak was present in the bingo hall when the incident occurred. According to plaintiff and bingo volunteer Marsha Ellison, Officer Bircsak was sitting in the snack bar area, approximately thirty-five feet away from where the incident took place. After being asked by Ellison to assist Connor, Officer Bircsak walked over and watched the altercation. Connor told Officer Bircsak: "You saw what happened. I want her arrested." According to Connor, Officer Bircsak responded that he could not arrest anyone because he was a "rookie" and "wasn't supposed to be there." A bingo volunteer then summoned the police.

Approximately fifteen minutes after the incident, Officer Foster Badgley of the Newark Police Department arrived at the scene. Officer Badgley and Officer Bircsak went outside to talk for a few minutes. When Officer Badgley returned inside, he asked plaintiff if she "was sure she wanted to make this complaint." Connor told Officer Badgley that Powell had assaulted her with a chair and that she wanted Powell arrested. Powell admitted to striking Connor several times with the chair, but claimed that plaintiff had threatened her with a fork and that she hit Connor in self-defense. Powell did not specify whether the fork was made of plastic or metal. However, the record reflects that the only forks in the bingo hall were plastic forks given to the public and two metal forks used to cook hotdogs in the snack bar area. Ellison testified that she was in possession of the two metal forks that day.

Following the incident, neither Connor nor Powell exhibited any signs of injury. Officer Badgley asked Powell to point out the fork used by Connor in the attack, but she could not. Officer Badgley did not ask Powell to describe the fork. Officer Badgley stated that he did not look for the fork because he "wasn't going to start searching the premises for an item" when he "couldn't tell ... whether that was the item or not." Officer Badgley also refused plaintiff's request to take a chair to the police station as evidence because Connor could not identify from the hundreds of wooden chairs in the bingo hall the specific chair Powell used to strike her. Officer Badgley did not speak to any of the approximately fifty people in the bingo hall about the incident. Likewise, none of the witnesses approached Officer Badgley to tell him what took place.

According to plaintiff, both women voluntarily accompanied Officer Badgley to the East District police station of the Newark Police Department. Plaintiff testified that she believed she was going to the police station to file a complaint. By contrast, Officer Badgley stated in his deposition that the women were arrested at the scene. Officer Badgley explained:

I advised them that if they wished to make complaints against each other both would be arrested. If they did not wish to make complaints against each other, neither one would be arrested. They both stated they wanted the other one arrested. I arrested both of them.

When Connor arrived at the East District station, she saw Powell's daughter, a Newark police officer, in uniform. Connor and Powell repeated their conflicting factual allegations to the police. Powell signed a complaint against Connor alleging that Connor attacked her with a fork. Powell was charged with simple assault and was issued a summons. She was immediately released.

In what the Appellate Division correctly characterized as inartfully drafted complaints with erroneous statutory citations,[1] plaintiff was charged on a complaint and warrant with aggravated assault and possession of a dangerous weapon, a fork, for an unlawful purpose. The police issued a separate summons and complaint against plaintiff, charging her with possession of a dangerous weapon, a fork. Because all of the complaints filed against plaintiff contained erroneous statutory citations, to determine exactly what charges were intended is difficult.

It is undisputed, however, that unlike Powell, Connor was charged with serious indictable offenses, arrested, and placed in jail. Connor testified that when she arrived at the station, Officer Badgley first told her that she was under arrest. She was then handcuffed and chained to a chair. Connor was permitted to make one telephone call to her lawyer. Her attorney spoke with Sergeant John Cantalupo, the booking sergeant and acting desk lieutenant on duty at the time the charges were filed.

---

[1] In a warrant and complaint, Connor was charged with aggravated assault. However, the charging documents refer to N.J.S.A. 2C:12–1b(5), which pertains to assaults on police officers. In a second count, Connor was charged with possession of a weapon, a fork, for an unlawful purpose, but the complaint refers to N.J.S.A. 2C:39–5b, which describes possession of a handgun without a permit. In a separate summons and complaint, Connor was charged with possession of a dangerous weapon, a fork, citing N.J.S.A. 2C:39–4a, which describes possession of a firearm for an unlawful purpose.

While at the East District Precinct, Connor demanded to be taken to a hospital and was transported to University Hospital at 4:00 p.m. According to Connor, Officer Bircsak visited her at the hospital and implored her not to report him because he was a rookie cop and did not want another incident reported against him. Two other officers directed Connor to sign a complaint they had prepared against Powell for simple assault, but Connor refused. Connor stated that one officer threatened that if she did not sign the complaint she was "going to have big trouble."

At 7:00 p.m., Connor returned from the hospital to the East District station. Shortly thereafter, she was transferred to the Newark Police Department's main headquarters at Green Street, where she was placed in a jail cell at approximately 7:30 p.m. Thereafter, Connor had no contact with any of the officer defendants. The cell-block personnel were responsible for Connor's bail procedure and release. Plaintiff never discussed bail with any of the defendants. At Green Street, Connor saw Powell, who was unrestrained, sitting with her husband, a retired Newark police officer, and her daughter, a current member of the Newark police force.

An "on-call" municipal court judge set bail in the amount of $350 sometime during the day of the arrest, as indicated in handwriting on the face of the complaint. There are no documents indicating the name of the officer who placed the bail call or the time at which the call was placed. Lieutenant Mandriota stated in his deposition that he had no knowledge of any record or log kept in that regard. That Connor was never told about bail is uncontroverted. While in the jail cell, Connor asked numerous officers when she was going to be released, but the officers ignored her. Plaintiff contends that because this was her first arrest she knew nothing about the procedures for posting bail.

Plaintiff's friend, Barbara Grossman, testified that she made several inquiries of the police concerning Connor's release. Grossman asked a receptionist at Green Street about the procedure for Connor's release, and he replied that nothing could be

done until the following day. Grossman also stated that she made five or six telephone calls during the night seeking information about Connor's release, although she did not remember the names of the individuals with whom she spoke. Finally, at 7:00 a.m. on Sunday, Grossman spoke with a police matron who instructed her to call a bail bondsman. Grossman contacted a bail bondsman who inquired on Connor's behalf and learned that her bail had been set. Grossman and plaintiff's daughter arrived at 11:30 a.m. on Sunday with the bail money. Bail was not posted until about 3:30 p.m. on Sunday, more than twenty-four hours after Connor had been arrested. The delay in Connor's release was caused, at least in part, by the police personnel's need to photograph and fingerprint Connor on Sunday afternoon.

On Monday, the Essex County Prosecutor's Office reduced the charges against plaintiff from indictable offenses to petty disorderly persons offenses. Connor was acquitted of the downgraded charges at trial in the Newark Municipal Court. By contrast, Powell was found guilty of simple assault by the municipal court.

Plaintiff subsequently filed a complaint against Powell, the City of Newark, Officer Bircsak, Officer Badgley, Sergeant Cantalupo, and Lieutenant Mandriota. Powell died following the filing of the complaint, and the action against her was dismissed. Plaintiff's claims against the remaining defendants for false arrest and imprisonment, malicious prosecution, and violation of the Civil Rights Act proceeded to trial.

At the trial, Connor and five eyewitnesses testified to the unprovoked attack. Connor asserted that Powell received favored treatment because of her familial relationship with the Newark Police Department. On prior notice to the court and counsel, selected portions of the deposition transcripts of the individual defendants, Officers Bircsak, Badgley, Cantalupo and Mandriota were read to the jury. In his deposition, Officer Bircsak denied providing any information to Officer Badgley, noting that, "[t]here was no need because both parties described the incident." Officer Bircsak also denied seeing any type of weapon in either Powell's

or Connor's possession. Officer Bircsak stated that he did not look for the fork because "there was a lot of confusion."

Officer Badgley stated in his deposition that he made the initial determination that plaintiff would be charged with the more serious charges and Powell would be charged with a simple assault "[b]ased on statements that was [sic] made to me by Miss Connor and Miss Powell and my conversation with Sergeant Cantalupo." Officer Badgley further stated that he and Sergeant Cantalupo charged Connor with the more serious offenses because they believed that a fork constituted a deadly weapon, while a chair did not. Officer Badgley and Sergeant Cantalupo further determined that sufficient probable cause existed to issue a warrant, rather than simply a summons for Connor's charges. Sergeant Cantalupo stated in his deposition that as acting desk lieutenant in charge of the precinct, it was his duty to determine when a warrant, as opposed to a summons, should issue on a complaint.

When Sergeant Cantalupo's shift ended on the day of plaintiff's arrest, Lieutenant Richard Mandriota came on duty as acting lieutenant in charge of the precinct. In his deposition, Lieutenant Mandriota stated that he reviewed the paperwork submitted by Officer Badgley to make sure the statutory citations corresponded with the proper charges.

Penelope Powell signed both of the complaints with the notation, "[s]ubscribed and sworn to before me this 14th day of May, 1994," above the jurat supposedly administered by Acting Lieutenant Mandriota. At his deposition, however, Lieutenant Mandriota stated that when he was presented with the complaints they were already signed. He further testified that although he "signed off on the summons and the warrant," he never asked Powell to describe the facts that gave rise to the allegations contained in the complaints, nor did he review any sworn statements of Powell or anyone else to make a determination of whether probable cause existed or whether a summons or warrant should issue. Rather, Mandriota claimed that Officers Bircsak and Badgley and Ser-

geant Cantalupo determined the charges that were to be brought against Connor.

At the conclusion of plaintiff's case, defendants' motions for involuntary dismissal of all of plaintiff's causes of action were granted. The court dismissed plaintiff's claims under the Tort Claims Act for failure to meet the threshold requirement of *N.J.S.A.* 59:9–2(d) of the loss of bodily function and medical treatment expenses in excess of $1000.00. The trial court also dismissed the Section 1983 claim against the City of Newark based on counsel's concession that he could not show the requisite pattern and practice to establish municipal liability. Plaintiff does not appeal those dismissals.

Plaintiff does, however, vigorously contest the trial court's involuntary dismissal of plaintiff's Section 1983 claims against the officers. The court found, as a matter of law, that probable cause existed for plaintiff's arrest and imprisonment. The trial court, however, did not state its factual findings. Instead, it summarily disposed of the probable cause issue as follows:

> I'm satisfied that based upon the line of questioning on the plaintiff's case that the plaintiff has taken a position that the police officer should have conducted further investigations before the arrest was made.
>
> I'm satisfied based upon the testimony that has been presented by the plaintiff that the officer and/or officers had probable cause to arrest. I make that ruling as a matter of law. And that there are no fact issues on which a reasonable jury could differ. That's my finding in this case.

The following day, plaintiff made an informal reconsideration motion asserting that even if probable cause were found to exist for her initial arrest, her claim for extended detention should survive. Plaintiff's counsel explained that he had "overlooked" the Section 1983 cause of action for extended detention at trial. The trial court denied plaintiff's application.

Plaintiff, contending that her Section 1983 claims should have been submitted to the jury, appealed to the Appellate Division. In an unpublished opinion, the Appellate Division affirmed the involuntary dismissal of plaintiff's claims. The Appellate Division, emphasizing that "[p]robable cause is an elusive concept heavily

dependent upon a particular factual complex," concluded that the officers could defend against the Section 1983 claim because probable cause existed to arrest plaintiff for aggravated assault. The panel reasoned that under *N.J.S.A.* 2C:12–1b(2), to attempt to cause bodily injury to another with a deadly weapon is a third-degree crime. *N.J.S.A.* 2C:11–1c defines a "deadly weapon" as any device or instrument which in the manner it is used or intended to be used is capable of producing death or serious bodily injury. The court observed that "even a plastic fork can be used in an aggressive fashion to cause severe injury to the victim's eyes or her sensitive parts of the body." As a result, the court held that Powell's sworn statement that plaintiff attacked her with a fork provided probable cause to arrest plaintiff for aggravated assault. The Appellate Division also found that the police reasonably could have believed that probable cause existed based on the specific facts known to them, citing *Kirk v. City of Newark*, 109 *N.J.* 173, 536 *A.*2d 229 (1988). The Appellate Division conceded that "it is certainly arguable that the police should have issued a summons rather than a warrant and a complaint." The court was unconvinced, however, that the police officers' failure to follow the summons prescriptions contained in *Rule* 3:4–1 qualifies as a violation of a federal constitutional right actionable under Section 1983. Because plaintiff did not advance her Section 1983 claim for her extended detention at trial, the panel did not consider that claim.

We granted plaintiff's petition for certification. 158 *N.J.* 685, 731 *A.*2d 45 (1999).

## II.

In *Wildoner v. Borough of Ramsey*, 162 *N.J.* 375, 744 *A.*2d 1146, also decided today, we held that a law enforcement official may defend a Section 1983 claim arising from an arrest or search "by establishing either that he or she acted with probable cause, or even if probable cause did not exist, that a reasonable police officer could have believed in its existence." *Wildoner,*

*supra,* 162 *N.J.* at 386, 744 *A.*2d 1146) (quoting *Kirk, supra,* 109 *N.J.* at 184, 536 *A.*2d 229). When the law enforcement official could reasonably have believed in the existence of probable cause, the issue of probable cause generally should be decided as a matter of law. *Kirk, supra,* 109 *N.J.* at 185, 536 *A.*2d 229. If officers of reasonable competence could disagree on the issue of probable cause, the doctrine of qualified immunity should be applied. *Malley v. Briggs,* 475 *U.S.* 335, 341, 106 *S.Ct.* 1092, 1096, 89 *L.Ed.*2d 271, 278.

 Qualified immunity protects all officers "but the plainly incompetent or those who knowingly violate the law." *Malley, supra,* 475 *U.S.* at 341, 106 *S.Ct.* 1092, 1096, 89 *L.Ed.*2d 271, 278 (1986). A bare allegation of malice is insufficient to defeat immunity if the defendant acted in an objectively reasonable manner. *Id.* at 341, 106 *S.Ct.* at 1096, 89 *L.Ed.*2d at 278. In order to enjoy qualified immunity, the official must demonstrate that "his conduct was justified by an objectively reasonable belief that it was lawful." *Gomez v. Toledo,* 446 *U.S.* 635, 640, 100 *S.Ct.* 1920, 1924, 64 *L.Ed.*2d 572, 577.

Probable cause exists if at the time of the arrest "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Wildoner, supra,* 162 *N.J.* at 389, 744 *A.*2d 1146 (quoting *Beck v. Ohio,* 379 *U.S.* 89, 91, 85 *S.Ct.* 223, 225, 13 *L.Ed.*2d 142, 145 (1964)).

## III.

 Our review of the record leads us to conclude as a matter of law that there was no probable cause to issue a complaint, and that no objectively reasonable police officer would have believed that probable cause existed to arrest plaintiff and issue a complaint-warrant against plaintiff for the aggravated assault and weapon offenses. A basic premise of plaintiff's argument is that

the police violated her constitutional rights by failing to issue a summons rather than a warrant. That procedure led to plaintiff's arrest and imprisonment for twenty-four hours. The rule in effect in 1994, at the time of the arrest, provided that a complaint-warrant should be issued only where the complaint charges murder, kidnapping, aggravated manslaughter, manslaughter, robbery, aggravated sexual assault, sexual assault, aggravated criminal sexual contact, criminal sexual contact, aggravated assault, aggravated arson, arson, burglary, first or second degree drug offenses, any crime involving the possession or use of a firearm, or conspiracies or attempts to commit such crimes. *See R.* 3:4–1(b) (1994). As previously observed, in this case the charges were so inaccurately drawn that it is difficult to determine exactly what charges were intended. However, it is also clear that Connor was not charged with any of those listed offenses.

For all other offenses, including the crimes with which Connor was charged, the 1994 rule provided that a complaint-summons must be issued unless the officer determines: (1) the person has previously failed to respond to a summons; (2) the officer has reason to believe that the person is dangerous; (3) there are one or more outstanding arrest warrants for the person; (4) the prosecution of the offense or offenses for which the person is arrested or the prosecution of any other offense or offenses would be jeopardized by immediate release; (5) the person cannot be satisfactorily identified; or (6) the officer has reason to believe the person will not appear in response to the summons. *See R.* 3:4–1(d)(1) to (6)(1994). Clearly, none of those circumstances justifying issuance of a complaint-warrant existed in this case. Therefore, under those guidelines, the police erred in issuing a complaint-warrant.

However, even if a police officer erred in issuing a complaint-warrant, that "does not constitute a *per se* violation of plaintiff's constitutional rights." *Sanducci, supra,* 315 *N.J.Super.* at 485, 719 *A.*2d 160 (quoting *O'Brien v. Borough of Woodbury Heights,* 679 *F.Supp.* 429, 437 (D.N.J.1988)). It is, however, a

factor that must be considered in determining whether the police officers had probable cause or whether they reasonably believed that probable cause existed.

The relevant inquiry in determining objective reasonableness is whether a reasonable officer, in view of well-established law and the information the officers possessed, could have believed that probable cause existed to arrest plaintiff. In *Malley v. Briggs,* the Supreme Court in applying the objective reasonableness test held that a police officer would "not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue...." *Malley, supra,* 475 *U.S.* at 341, 106 *S.Ct.* at 1096, 89 *L.Ed.*2d at 278.

A plain reading of the requirements of *R.* 3:4–1(b) would lead any officer to conclude that complaint-warrants were not to be issued in this case. If plaintiff should have been charged at all, then only a complaint-summons should have been prepared and plaintiff, like Powell, should have been immediately released. Based on the totality of circumstances: the lack of evidence against plaintiff, the plain language of *R.* 3:4–1(b), and the different treatment afforded Powell, we conclude that no reasonably objective officer would have arrested plaintiff and issued a complaint-warrant resulting in her imprisonment. *Gurski v. State Police Dept.,* 242 *N.J.Super.* 148, 162, 576 *A.2d* 292 (1990) (holding that police officers acted unreasonably in conducting search).

Specifically, no prudent police officer reasonably could have believed that plaintiff possessed a dangerous weapon or used it to assault Powell. A "weapon" is defined as "anything readily capable of lethal use or of inflicting serious bodily injury." *N.J.S.A.* 2C:39–1r. First, although Powell did not specify whether the fork was made of metal or plastic, and the officers did not ask, indeed, the record established that the fork was plastic. Although some weapons are *per se* deadly, such as firearms, other instruments are deadly only if in the manner used or intended to be used, they are capable of producing death or serious bodily injury. Courts of other jurisdictions have deemed a metal fork a "deadly

weapon." *See, e.g., State v. Kiluk,* 120 *N.H.* 1, 410 *A.*2d 648, 651 (1980) (holding that metal fork used to strike person in eye was deadly weapon); *People v. Moran,* 33 *Cal.App.*3d 724, 109 *Cal. Rptr.* 287, 291 (1973) (holding that three-pronged metal fork constituted deadly weapon). However, no reported case has considered a plastic fork to be a deadly weapon. The totality of circumstances in this matter demonstrate that no objectively reasonable police officer would find that the plastic fork allegedly used by plaintiff was a "deadly weapon."

Secondly, serious bodily injury is defined in *N.J.S.A.* 2C:11–1b as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Second degree aggravated assault is defined as causing or attempting to cause serious bodily injury to another. It is undisputed that no one was seriously injured in this case. No officer reasonably could have considered a plastic fork a dangerous weapon, nor could an officer reasonably conclude that plaintiff attempted to cause serious bodily injury with such a fork.

Plaintiff and five independent witnesses testified at trial, from among the fifty or more eyewitnesses, to the events leading to her arrest. Powell admitted to the police that she struck plaintiff several times with a wooden chair. Every witness who testified at trial attested to Powell's unprovoked attack on the unarmed plaintiff. Indeed, Powell also struck a volunteer at the bingo hall with a chair. In their on-the-scene "investigation," the police did not speak to anyone at the bingo hall about the incident other than the two parties directly involved. Even defendant Officer James Bircsak, who was at the scene at the time of the incident, provided no information to the arresting police with regard to the facts of the incident. Officer Bircsak did state that he did not see a weapon in the possession of either of the parties.[2] Thus, aside

---

[2] We observe that Officer Bircsak's statement that he did not see any weapons in either woman's possession is suspect, given that a number of witnesses

from Powell's unsupported oral statement, there was not a scintilla of evidence to support a finding of probable cause against plaintiff for the indictable charges forming the basis of her arrest.

The Appellate Division, in concluding that probable cause existed to arrest plaintiff for aggravated assault, placed great reliance on the fact that Powell made a sworn statement. The Appellate Division panel cited a recent opinion by the same panel, *Sanducci v. City of Hoboken*, 315 *N.J.Super.* 475, 719 *A.*2d 160 (App.Div. 1998), in which a complainant's sworn statement provided probable cause for an arrest. In *Sanducci*, police officers witnessed a fight between four individuals who were arrested and subsequently charged with simple assault. *Id.* at 479, 719 *A.*2d 160. In a separate summons and warrant, one defendant, Sanducci, was charged with fourth-degree stalking based upon the sworn statement of McDonald, another party to the fight. *Ibid.* McDonald claimed that Sanducci had stalked her on three prior occasions. *Ibid.* Sanducci argued that McDonald's sworn statement did not justify her arrest and detention for fourth-degree stalking. *Id.* at 480, 719 *A.*2d 160.

The *Sanducci* court concluded that plaintiff's arrest for stalking was supported by probable cause. *Id.* at 482, 719 *A.*2d 160. Although the court acknowledged that McDonald and Sanducci were adversaries, it determined that the police nevertheless acted reasonably in relying upon McDonald's sworn statement. *Ibid.* The court explained: "[t]here is an assumption grounded in common experience that . . . [an ordinary citizen], in reporting criminal activity, would be motivated by factors which are consistent with law enforcement goals." *Ibid.* The court further noted that the reliability of the allegation is heightened "when the citizen provides the police with a sworn statement, thus subjecting himself or herself to potential civil or criminal liability." *Ibid.*

---

testified that he observed the altercation. Officer Bircsak's claim that he did not provide any information to Officer Badgley is equally suspect, given that following the incident, the two officers went outside to talk for a few minutes.

Unlike the witness in *Sanducci,* Powell did not provide a sworn statement to the police. The only document that might be deemed a sworn statement are the complaints purportedly signed by Powell in Lieutenant Mandriota's presence. However, Mandriota stated in his deposition testimony that those complaints had been presented to him for his review and signature after they had been signed by Powell, outside his presence. Mandriota also stated that he did not meet with Connor or Powell, that he never asked Powell which facts gave rise to the statements in the complaint, and that there were no statements signed by Powell in the paperwork he reviewed. Even though Mandriota testified that it was his duty to make a determination that there was sufficient probable cause to issue the complaint, he also acknowledged that after reviewing the paperwork he "signed off," and the determination of the sufficiency of probable cause was made by the officers and on-duty lieutenant at the time. Later in his deposition, Lieutenant Mandriota provided inconsistent testimony, suggesting that Powell signed the complaints in his presence. However, reading Mandriota's entire deposition, it is evident that he never spoke to Powell about her assertions in the complaint, never reviewed any statements made by Powell, and never reviewed the complaints to determine if there was probable cause for their issuance. Under those circumstances, Powell's statement that Connor threatened her with a fork was not sufficient to provide the officers with probable cause to arrest her for aggravated assault.

Even assuming arguendo that Powell's sworn complaints were interpreted by this Court to be a sworn statement akin to the statement in *Sanducci,* this Court must also consider the totality of the circumstances under which a statement was made, including the relationship and motive of the private citizen-informant, in evaluating whether the officers acted in an objectively reasonable manner in believing that probable cause existed. In *Wildoner,* we held that a private citizen's statements that were corroborated by the police through their independent investigation were sufficient under those circumstances to establish that the police reasonably

believed they had probable cause to arrest Mr. Wildoner for domestic violence against his wife. *Wildoner, supra,* 162 *N.J.* at 394, 744 *A.*2d 1146. In *Wildoner,* the informing witness was the plaintiff's neighbor, who after hearing loud and abusive language coming from plaintiff's apartment, made a report to the police out of concern for plaintiff's wife's safety. *Id.* at 380, 744 *A.*2d 1146. Likewise, in *Kirk,* the informant was an investigator for the Division of Youth and Family Services, motivated by her desire to prevent harm to a child. *Kirk, supra,* 109 *N.J.* at 176, 536 *A.*2d 229. Here, by contrast, the complainant was plaintiff's adversary. The only facts supporting Powell's account of the events were her uncorroborated statements. Therefore, the totality of circumstances in this case do not support defendants' argument that they acted in an objectively reasonable manner in concluding that probable cause existed.

The Appellate Division also found that due diligence did not require the police to conduct any investigation of the situation before charging Connor with the indictable offenses. The court, quoting *Kirk,* stated: "we are aware of no constitutional principle 'that a police officer who reasonably believes he has probable cause must conduct further investigation or risk a subsequent charge of failing to exercise diligence'". However *Kirk* states that an officer is not required to conduct further investigation *once he reasonably believes he has probable cause. Kirk, supra,* 109 *N.J.* at 188, 536 *A.*2d 229. In *Kirk,* the Court rejected a claim that an investigator of the Division of Youth and Family Services was unreasonable in not conducting a more thorough investigation on whether a three-year-old child had been scalded. *Id.* at 189, 536 *A.*2d 229. In both *Wildoner* and *Kirk,* we found that a critical factor in determining whether the officer reasonably believed that he or she had probable cause was the nature of the incident underlying the complaint. In *Wildoner,* the incident involved an allegation of domestic violence. *Wildoner, supra,* 162 *N.J.* at 394, 744 *A.*2d 1146. In *Kirk,* the police detective was confronted with the possibility of child abuse. *Kirk, supra,* 109 *N.J.* at 187, 536 *A.*2d 229. Here, by contrast, the factual circumstances involving

an altercation between two individuals at a bingo hall were not so compelling that the police could not have conducted further investigation prior to charging Connor with aggravated assault.

In reaching this conclusion, we do not intend to suggest that police are always required to conduct a further investigation before establishing the required reasonable belief that there is probable cause to effect an arrest. As we noted in *Kirk,* "[s]uch a rule could paralyze police and prevent them from acting to protect the public." *Kirk, supra,* 109 *N.J.* at 188, 536 *A.*2d 229. We simply hold that under the factual circumstances presented here, the police could not reasonably have believed that probable cause existed to charge Connor with aggravated assault. Aside from Powell's allegation, there was no evidence to support a finding of probable cause for the indictable charges forming the basis of Connor's arrest. Contrary to the Appellate Division's finding, Powell never provided a sworn statement to the police, and it is unclear whether she ever swore to the complaints. Even if Powell had made accusatory statements at the scene, they were insufficient to establish probable cause. Officer Badgley conducted absolutely no investigation to determine the veracity of Powell's accusation. None of the some fifty eyewitnesses, including Officer Bircsak, were questioned by Officer Badgley. Both Officer Bircsak and Officer Badgley admitted they did not even attempt to look for the fork. Under the circumstances, it cannot be held as a matter of law that the police acted in an objectively reasonable manner in arresting plaintiff on the word of the complainant alone, particularly when all the evidence was contrary to such a conclusion.

## IV.

The Appellate Division refused to consider plaintiff's Section 1983 claim for her extended detention, concluding that the argument was not advanced at trial. Defendants characterize plaintiff's extended detention claim as "a belated attempt to create a new basis of recovery." When the trial judge asked counsel to

identify plaintiff's causes of action, counsel did not clearly articulate a Section 1983 claim for extended detention.

 Although we do not consider the issue of whether defendants are also liable under Section 1983 for plaintiff's extended detention, we observe that plaintiff has failed to establish that the officer defendants named in the complaint participated in the bail procedure. "An *individual* cannot be liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Harrington v. Lauer*, 893 *F.Supp.* 352, 355 (D.N.J.1995) (internal quotations and citation omitted) (emphasis in original). In order to prevail against a specific defendant, a plaintiff must establish personal involvement by that defendant in the alleged constitutional deprivation to be entitled to damages. *McKinnon v. Patterson*, 568 *F.*2d 930, 934 (2d Cir.1977), *cert. denied*, 434 *U.S.* 1087, 98 *S.Ct.* 1282, 55 *L.Ed.*2d 792 (1978). The record reveals that none of the defendants saw plaintiff after 7:30 p.m. on Saturday. The record shows that Lieutenant Mandriota and Sergeant Cantalupo were in charge of supervising the East District precinct. They were not, however, responsible for supervising the Green Street jail. The officer in charge of the Green Street cell block was responsible for assuring that bail was set. Presumably, one of the Green Street officers would have been charged with informing plaintiff that bail had been set.

## V.

The record establishes that there was no probable cause to arrest and to issue a complaint-warrant to plaintiff and that no 'police officer reasonably could believe that probable cause existed to do so. From the record, all of the officer defendants were either involved in the arrest or in the issuance of complaint-warrants for the aggravated assault and weapon offenses. Defendants failed to assert as an alternative defense that if their motions for dismissal were reversed material facts remained in dispute that would require a new trial on liability. Accordingly,

the judgment of the Appellate Division is reversed and the case is remanded for a trial on damages in accordance with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7.

*Opposed*—None.