46 A.3d 591

RICHARD GREENBERG, PLAINTIFF–APPELLANT, v. NEW JER-
SEY STATE POLICE TROOPER NICHOLAS J. PRYSZLAK,
NEW JERSEY STATE POLICE SERGEANT STEVEN M.
JONES, NEW JERSEY STATE POLICE, PETER MORAN, JR.,
AND OIL STATION, INC., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued June 5, 2012—Decided June 26, 2012.

592

Before Judges FISHER, BAXTER and NUGENT.

*Jose W. Hernandez* argued the cause for appellant (The *Ferrara Law Firm, LLC,* attorneys; *Michael A. Ferrara, Jr.,* on the brief).

*Roshan D. Shah,* Deputy Attorney General, argued the cause for respondents Pryszlak, Jones, and the New Jersey State Police (*Jeffrey S. Chiesa,* Attorney General, attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Mr. Shah,* on the brief).

*Erin R. Thompson* argued the cause for respondents Moran and Oil Station, Inc. (Powell, Birchmeier & Powell, attorneys; *Ms. Thompson,* on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

In this appeal, we consider whether the trial judge erred in summarily dismissing plaintiff's claims of, among other things, false imprisonment, false arrest, federal and state constitutional violations, and common law torts, in connection with his arrest by a New Jersey State trooper based on suspicion that he had passed a bad check. Because pivotal questions about the propriety of plaintiff's arrest and the existence of probable cause could not be decided by resort to the moving and opposing papers, we reverse the orders of summary judgment entered in favor of defendants and remand.

I

A. *The Dispute*

This dispute innocently began on January 22, 2007, when plaintiff Richard Greenberg patronized the business of defendant Oil Station, Inc. (OSI). Plaintiff requested an oil change; Richard Pavone, who was managing the business that day, recommended a radiator flush and a cleaning of the vehicle's battery terminals. Plaintiff agreed. A short time later he watched mechanics push his car out of a garage bay, attach jumper cables to its battery from the battery of an adjacent car, and start his car. Plaintiff's car stopped running shortly thereafter, and the mechanics again used jumper cables to restart it.

Pavone told plaintiff there was a problem with the car's battery, that OSI did not have the equipment necessary to test it, and that plaintiff would have to take the car elsewhere to address the problem. OSI presented a bill for $129.44; plaintiff responded there was no problem with his car's battery before he came into

OSI and protested the $14.99 charge for "Battery Terminal SVC." Pavone advised plaintiff that he would have to speak with defendant Peter Moran about any reduction in the bill. Plaintiff asked Pavone to note on the bill what had occurred with the battery; Pavone wrote: "Cleaned battery terminals then car would not start 2 times/then only after a jump from other car started after jump both times. Terminals were not removed."

Plaintiff paid $129.44, which included the disputed $14.99 charge for battery cleaning, thinking "that I would just see Mr. Moran the next morning." Plaintiff paid by check drawn on his account with Wachovia Bank. According to plaintiff, Pavone recommended that plaintiff take his car to a nearby Pep Boys to have the battery problem checked.

Plaintiff left OSI and immediately drove to Pep Boys where, upon entering the parking lot, his car again "died." The mechanics at Pep Boys examined the battery and determined that a "battery post was snapped." Plaintiff was told that "it looked like somebody tried to undo the terminal" and "probably snapped the battery post." The mechanics told plaintiff he needed a new battery, which plaintiff purchased and Pep Boys installed at a cost of $87.72.

The next morning, plaintiff returned to OSI and spoke with Moran concerning the broken battery post and the charge for cleaning the battery terminals. No other customers were present. Moran cursed at him and refused to adjust the bill. Plaintiff told Moran that, because the problem could not be resolved amicably, he would "stop payment on [his] check." [1]

Plaintiff left OSI and went to Wachovia Bank and "told them that [he] needed to stop payment on a check." Plaintiff also

---

[1] Moran provided a different version at his deposition. Moran testified that there were customers in the waiting room that morning and that plaintiff loudly cursed at him. According to Moran, plaintiff left the shop, threatening to "go cancel the check" and to "close my account out." Because plaintiff was the opponent of the summary judgment motion, we assume the truth of plaintiff's version.

noticed that one of his checks was missing; a bank representative recommended that he close the account as a precaution. Plaintiff followed that advice and transferred the balance of his account—$1096.14—to a new account. Plaintiff directed the bank to honor all outstanding checks except the one given the day before to OSI, directing the bank to stop payment because "the service was not performed as charged and damage was done to [his] automobile."

After leaving the bank, plaintiff wrote to Moran, setting out the circumstances leading to his purchase of a battery from Pep Boys and claiming OSI was only entitled to $31.02.[2] Plaintiff enclosed a check for $31.02, which was drawn on his new bank account. In the letter, plaintiff stated that the enclosed check "in the amount of $31.02 [was] to replace" the $129.44 check given OSI on January 22, 2007. The letter was undated but the new check was dated January 25, 2007; Moran received both on January 27, 2007. Moran later received a returned-check notice from his bank, which advised that Greenberg's check for $129.44 was being returned because Greenberg's account had been "closed"; OSI's bank charged a $10 fee for the returned check.

On January 30, 2007, Moran wrote to Greenberg, rejecting the $31.02 payment and demanding payment of $129.44, plus the $10.00 bank fee. Moran stated in the letter that "if I do not receive certified payment within seven days of this letter I will be forced to file a motion in small claims court." Moran enclosed Greenberg's $31.02 check, cut in half.

### B. The State Police Investigation

Even though the record demonstrates that Moran believed the proper forum for this dispute was small claims court, he nevertheless decided to bring the matter to the attention of the New

---

[2] Plaintiff asserted that he owed OSI the charged amounts for the oil change ($60.99), and the radiator work ($49.99), but not for the battery cleaning ($14.99). Adjusting the amount of sales tax ($7.76), plaintiff calculated that he should have been billed $118.74, not $129.44. And, from that amount, plaintiff subtracted the $87.72 he paid Pep Boys for the new battery, resulting in a balance of $31.02 due OSI.

Jersey State Police. In fact, the record reveals that Moran had called the State Police on numerous occasions in the past to deal with "unruly" customers, bad checks, or rejected credit cards. When dealing with bad checks or rejected credit cards, Moran would telephone the State Police, which would send a trooper to prepare a report for Moran's later use in small claims court. On more than one occasion, however, a trooper would go to the customer's house and bring the customer back to OSI's place of business, telling the customer, in words or substance, that "if you don't go pay this bill you're going to be charged. So if you're smart you'll take care of your obligation and go pay the bill and that will be the end of it."

On February 12, 2007, Moran telephoned the State Police to report Greenberg's "bad check." Trooper Nicholas J. Pryszlak was dispatched to investigate.[3] That day Pryszlak met Moran at OSI's place of business, where Moran: stated he had received notice from his bank that plaintiff's check had been dishonored because the account had been closed; showed Pryszlak a copy of the dishonored check, along with a copy of Moran's letter of January 30, 2007; and told Pryszlak that Greenberg was a dissatisfied customer who was "upset with the service of his vehicle." Moran testified at his deposition that he informed Pryszlak he "was going to take [Greenberg] to Small Claims Court" and "just wanted a report to file with my motion in Small Claims Court." According to Moran, Pryszlak left to speak with Greenberg in order to resolve the matter.

Pryszlak telephoned plaintiff's residence twice on February 12, 2007, leaving messages on the answering machine. Greenberg did not return the calls. Pryszlak's messages advised "there was a complaint filed against [plaintiff] in the Township of Hainesport."

---

[3] Pryszlak had been employed as a trooper for about six months at this time; he was classified as a probationary trooper and would remain so during a five-year probationary period. Although Pryszlak stated that he had dealt with a lot of bad check cases by the time of his deposition in May 2010, this investigation was his first.

Plaintiff went to the Township's offices that day and verified there were no complaints filed against him.

On February 13, 2007, Pryszlak continued his investigation. He telephoned plaintiff that morning. Plaintiff viewed these telephone calls as an annoyance; he felt he was being harassed by a friend of Moran and asserted his belief that the State Police should not have been acting as a collection agency in what was a civil matter that belonged in small claims court.[4]

Following the telephone call, Pryszlak went to OSI and obtained written statements from Moran and Pavone. He also obtained from Moran copies of plaintiff's letter and other relevant documentation.

Later that day, Pryszlak went to plaintiff's home in an effort, in Pryszlak's words, to "steer him in the right direction." According to Pryszlak's report, he read *N.J.S.A.* "2C:21–5 to [plaintiff] and stated that he will be charged with this statute if he did not make the payment of $129.44." Pryszlak wrote in his report that plaintiff replied in an "arrogant tone" that he did not care and that he was not going to make any payment. Pryszlak also wrote in his report that he then told plaintiff that "[i]f he makes the payment he would not be charged with the violation and if he dislikes the service provided by [OSI], file it in small claims." According to Pryszlak, plaintiff "again firmly declined." Pryszlak told plaintiff that he had "10 days to this date to make payment or he will be charged with [*N.J.S.A.*] 2C:21–5." Pryszlak acknowledged at his deposition that plaintiff stated at that time that he was not going to pay OSI and that he "closed the account because he was dissatisfied with the service" provided by OSI.[5]

---

[4] Pryszlak's version of this telephone call differed. He testified at his deposition that he told plaintiff about the dishonored check and informed plaintiff that "failure to make payment was in violation of [*N.J.S.A.*] 2C:21–5." Again, at this stage, the trial judge was required to assume the truth of plaintiff's version.

[5] According to Pryszlak, plaintiff's statement that he closed the account and that he would not pay OSI constituted an admission that plaintiff had violated

Plaintiff testified at his deposition that, during the visit, Pryszlak was "very emphatic as to the crime that I committed without even hearing my side of the story" or having all of the documentation. Plaintiff gave Pryszlak copies of all the documents in his possession; Pryszlak said he would take the documents to a detective for a determination of whether a crime had been committed. Plaintiff also testified that he told Pryszlak that he was "not in violation of that code" and did not "knowingly pass a bad check." Plaintiff also told Pryszlak that he knew "how the game is played," that Pryszlak was harassing him to help Moran, that he often saw State Police vehicles parked in OSI's lot and troopers talking to Moran or OSI employees, and that he assumed that Pryszlak was Moran's "buddy who was doing him a favor."

Plaintiff testified at his deposition that, when Pryszlak left his home on February 13, 2007, he thought "the issue was resolved and Mr. Moran would take [him] to Small Claims Court"; that it was "a small civil matter ... to be proven in Small Claims Court, not a State Police matter."

### C. *Plaintiff Pays OSI's Bill*

Ten days later, on February 22, 2007, sometime between 7:00 a.m. and 8:00 a.m., Pryszlak returned to plaintiff's home and pounded on the front door until plaintiff's wife opened it. Pryszlak asked to see plaintiff, stating: "he knows why I'm here." Plaintiff entered the foyer and Pryszlak told plaintiff to "[g]et dressed, you're coming with me ... [y]ou're under arrest," even though Pryszlak did not have an arrest warrant. Plaintiff was handcuffed, led outside, escorted into a State Police vehicle, and

---

*N.J.S.A.* 2C:21–5. Such an admission, Pryszlak testified, provided a basis for plaintiff's arrest without an arrest warrant for the disorderly persons offense set out at *N.J.S.A.* 2C:21–5 and also revealed a "disrespect [for] any type of criminal law." Pryszlak also testified that plaintiff did not tell him that, when he wrote and submitted the check for $129.44 to OSI, he knew that his checking account was closed. And, in answer to plaintiff's request for admissions, Pryszlak admitted that "[plaintiff] did not tell defendant Trooper Pryszlak that when he gave [the $129.44 check to OSI that] he knew that the check would not be honored."

driven to a station, where he was handcuffed to a bench. According to plaintiff, Sergeant Steven M. Jones said to him: "[y]ou're not such a tough bastard now, are you Greenberg." Plaintiff told Jones he was willing to pay Moran in order to resolve the matter and that Jones then left the room, returning fifteen minutes later to announce that "you're a lucky guy, Greenberg. Moran's gonna take your money."

Plaintiff's wife obtained cash from the bank and followed Pryszlak's vehicle as he transported plaintiff to OSI. There, plaintiff paid the bill, obtained a receipt, and was released by Pryszlak. No criminal charges were ever filed against plaintiff.[6]

## II

Plaintiff brought this action against OSI, Moran, Pryszlak, Jones, and the New Jersey State Police, alleging false imprisonment, false arrest, battery, defamation, negligent hiring and supervision, vicarious liability, civil conspiracy, intentional infliction of emotional distress, federal and state constitutional violations, a violation of 42 *U.S.C.A.* § 1983, and a violation of the New Jersey Civil Rights Act, *N.J.S.A.* 10:6–1 to –2.

The trial judge determined, for reasons expressed in a written opinion, that Pryszlak had probable cause to arrest plaintiff and that all plaintiff's claims were undercut by that circumstance. He entered summary judgment in favor of all defendants on all the claims asserted by plaintiff.

## III

Plaintiff appeals, arguing that the trial judge erred: (a) in finding an arrest warrant was not required; (b) in determining Pryszlak had probable cause to arrest plaintiff and the State

---

[6] Plaintiff later filed a complaint in small claims court against Moran and OSI for the problems they caused to his vehicle. On May 7, 2007, plaintiff obtained a default judgment against Moran in the amount of $103.76, plus court costs.

Police, Pryszlak and Jones (the State defendants), therefore, were entitled to qualified immunity; (c) in granting summary judgment to Moran and OSI on the basis of the findings regarding the State defendants; and (d) in denying plaintiff's motion to strike an expert report submitted by the State defendants.

## A. *The Warrantless Arrest*

■ Plaintiff initially argues that the trial judge erred in concluding that "an arrest warrant was not required to arrest [p]laintiff in his own home." In response, the State defendants argue that the trial judge never drew such a conclusion because plaintiff never argued the warrantless arrest within the home was unlawful. From this, the State defendants argue that this court should not consider the issue as properly before us. Although we agree this particular point may not have been clearly or forcefully asserted in the papers plaintiff submitted in opposition to summary judgment, plaintiff certainly urged the point during oral argument in the trial court. Due to its importance to plaintiff's claims, we decline the invitation to reject the argument on procedural grounds.

■ Indeed, this point is dispositive of the issues on appeal. Physical entry into the home is the chief evil the Fourth Amendment was intended to prevent. *United States v. United States Dist. Ct.*, 407 *U.S.* 297, 313, 92 *S.Ct.* 2125, 2134, 32 *L.Ed.*2d 752, 764 (1972). This right is so cherished that, regardless of the existence of probable cause to make an arrest, a law enforcement officer may not enter a suspect's home to make an arrest without a warrant, exigent circumstances or consent. *Payton v. New York*, 445 *U.S.* 573, 589–90, 100 *S.Ct.* 1371, 1381–82, 63 *L.Ed.*2d 639, 652–53 (1980); *State v. Brown*, 205 *N.J.* 133, 145, 14 *A.*3d 26 (2011); *State v. Hutchins*, 116 *N.J.* 457, 463, 561 *A.*2d 1142 (1989). Although the State defendants' contention that Pryszlak had probable cause to arrest plaintiff was colorable, there is no doubt Pryszlak was without an arrest warrant and that no exigent circumstances surrounded this dispute about a $129.44 check. And, although defendants now assert that plaintiff's wife consent-

ed to Pryszlak's entry into the home, there is certainly a question of fact about whether his entry was consensual and, moreover, there is no evidence that plaintiff's wife was informed that Pryszlak sought entry for the purpose of arresting plaintiff. In short, the legitimacy of the arrest turns on whether voluntary consent was given to the entry, a matter that was not ripe for summary judgment.

## B. *Probable Cause And Qualified Immunity*

■ Although the absence of a lawful basis for Pryszlak's entry into plaintiff's home except consent—as to which there are genuine questions of material fact—requires a reversal of the summary judgment entered in favor of the State defendants,[7] we nevertheless, for the purpose of providing future guidance, consider the parties' contention regarding the presence of probable cause to arrest, which also is pivotal to the State defendants' claim of qualified immunity. We conclude that genuine factual disputes exist with regard to probable cause that further precluded summary judgment in favor of the State defendants.

Plaintiff was arrested based on Pryszlak's conclusion that the information before him revealed that plaintiff had violated *N.J.S.A.* 2C:21–5. To understand whether this assertion has merit, a brief examination of the statute's language is required. *N.J.S.A.* 2C:21–5 provides that "[a] person who issues or passes a check . . . for the payment of money, knowing that it will not be honored by the drawee, commits an offense[.]" When the dishonored check is for less than $200, the wrongful conduct constitutes a disorderly persons offense. *N.J.S.A.* 2C:21–5(c)(4). Viewing the

---

[7] On review, we apply the same standard that bound the trial judge, *Estate of Hanges v. Metropolitan Property & Cas. Ins. Co.*, 202 *N.J.* 369, 378, 997 A.2d 954 (2010), namely, that summary judgment is precluded when "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party," *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 A.2d 146 (1995).

facts in the light most favorable to plaintiff as the opponent of a motion for summary judgment, *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146, Pryszlak could only understand the information he had collected in his investigation as demonstrating a monetary dispute between plaintiff and OSI that would be resolved in civil court. Indeed, although plaintiff deliberately took steps to stop payment on the check in question, nothing in the information available to Pryszlak suggested that plaintiff *knowingly* intended to pass a bad check to OSI, an element required by *N.J.S.A.* 2C:21–5. *See State v. Kelm,* 289 *N.J.Super.* 55, 59, 672 *A.*2d 1261 (App.Div.), *certif. denied,* 146 *N.J.* 68, 679 *A.*2d 655 (1996). Pryszlak appeared to have understood that as well, because he turned to other statutory provisions that create a presumption that the issuer of the check knew that the check would not be paid.

One of those circumstances occurs when:

Payment was refused by the drawee for lack of funds, or due to a closed account, after a deposit by the payee into a bank for collection or after presentation to the drawee within 46 days after issue, and the issuer failed to make good within 10 days after receiving notice of that refusal or after notice has been sent to the issuer's last known address.

[*N.J.S.A.* 2C:21–5(b) ]

Pryszlak did not immediately arrest plaintiff after obtaining OSI representatives' statements as to what had occurred, but, instead, told plaintiff at their first meeting that he had ten days to pay OSI, and the arrest occurred after passage of that ten-day period. This circumstance strongly suggests that Pryszlak relied on this aspect of the statute to support his belief that probable cause existed. And that circumstance strongly suggests that Pryszlak realized plaintiff did not knowingly pass a bad check on January 22, 2007.

■ Of course, such an interpretation of the evidence only suggests which particular section of the statute Pryszlak may have relied on in determining he possessed probable cause to arrest plaintiff. The fact that the time frames contained in that portion of the statute coincided with what occurred here prior to the arrest, however, does not mean that probable cause existed. Such

an interpretation of the statute ignores an important fact that the State defendants concede, as they must: not every order to stop payment on a check constitutes a criminal offense. It is not unlawful for an individual to close an account or to stop payment on a check when a dispute develops between the individual and the recipient regarding the goods or services rendered by the latter, as here. In short, although the circumstances met the conditions of the knowledge presumption contained in *N.J.S.A.* 2C:21–5(b), that presumption is rebuttable.

Whether probable cause was present here requires a determination as to whether, at the time of the arrest, " 'the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *Connor v. Powell,* 162 *N.J.* 397, 409, 744 *A.*2d 1158 (quoting *Beck v. Ohio,* 379 *U.S.* 89, 91, 85 *S.Ct.* 223, 225, 13 *L.Ed.*2d 142, 145 (1964)), *cert. denied,* 530 *U.S.* 1216, 120 *S.Ct.* 2220, 147 *L.Ed.*2d 251 (2000). Although a selective approach to the information gathered by Pryszlak might support a prudent person's determination that plaintiff had committed an offense, all the evidence and statements in Pryszlak's possession-when viewed collectively and in the light most favorable to plaintiff-revealed that the parties were engaged in a civil dispute and a minor one at that; both plaintiff and Moran expressed to Pryszlak their expectation that the matter would be resolved in small claims court. Summary judgment principles preclude a determination that Pryszlak possessed probable cause to arrest plaintiff. In short, a factfinder might ultimately conclude that Pryszlak possessed probable cause to make an arrest, but there is a genuine dispute about that question that could not be resolved on a motion for summary judgment.[8]

---

[8] That same required approach negates a determination, at this stage, that plaintiff's statements to Pryszlak constituted an admission that plaintiff had violated *N.J.S.A.* 2C:21–5.

For these reasons, we conclude that the trial judge erred in granting summary judgment in favor of the State defendants.[9]

### C.  *Moran and OSI*

■  Plaintiff alleged that Moran and OSI engaged in a civil conspiracy with the State defendants to commit the torts of false arrest, false imprisonment and other alleged offenses.  In his written decision, the trial judge found that Pryszlak had probable cause to make the arrest and that plaintiff's claims against the State defendants were, therefore, not viable.  The trial judge observed that, "[i]n order to pursue a valid claim of civil conspiracy, there must be an underlying wrong which provides a right of action," and held that plaintiff's claim for conspiracy must fail because his probable cause finding eviscerated the false arrest and false imprisonment claims.  Because the dismissal of plaintiff's claims against Moran and OSI was grounded solely on the judge's finding that Pryszlak had probable cause, which was erroneously decided at this stage, the summary judgment entered in favor of Moran and OSI also must be reversed.

We intimate no view as to whether there may be other grounds upon which Moran and OSI might obtain a summary judgment that would not be dependent upon a dismissal in favor of the State defendants.  We would note, however, that there was evidence offered in opposition to Moran and OSI's motion that State Police vehicles had been seen at OSI in the past, and that plaintiff had observed troopers talking to Moran and other OSI employees; this evidence suggested the existence of good relationships between and among defendants.  Indeed, Moran acknowledged that, on more than one occasion, he had utilized State troopers to collect on bad checks by bringing customers to OSI so that payment could be made.  These circumstances, when viewed in the light

---

[9] We need not discuss the parties' arguments regarding the qualified immunity defense because, for the same reasons discussed with regard to the other issues, the State defendants' claim of qualified immunity is fraught with disputed factual questions that could not be summarily resolved.

most favorable to plaintiff, are supportive of plaintiff's claim of a civil conspiracy and the culpability and complicity of Moran and OSI. That is, plaintiff has presented a colorable contention that Moran and OSI were not simply citizens reporting a criminal offense to the proper authorities but, in fact, utilized the State defendants, who were willing to collect OSI's debt.

### D. *The Expert Report Submitted by the State Police*

■ Plaintiff also argues that the trial judge erred in denying his motion to strike the report of the State defendants' expert, John J. Ryan, who asserted that Pryszlak's actions in investigating the matter, determining whether probable cause existed, and arresting plaintiff were both reasonable and in line with standard police practices.

The trial judge denied plaintiff's motion to bar Ryan's testimony on the ground that it constituted a net opinion. In his written decision, the judge held "that the Ryan Report sufficiently sets forth the 'why and wherefore' of his opinion and cites the specific [factual] evidence and policies/procedures upon which that opinion is based; and as such, does not constitute a net opinion."

We have held in this regard that an expert's opinion must be based on facts to be admissible:

> As construed by applicable case law, *N.J.R.E.* 703 requires that an expert's opinion be based on facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial. Under the "net opinion" rule, an opinion lacking in such foundation and consisting of bare conclusions unsupported by factual evidence is inadmissible. The rule requires an expert "to give the why and wherefore" of his or her opinion, rather than a mere conclusion.

> [*Rosenberg v. Tavorath*, 352 *N.J.Super.* 385, 401, 800 *A.2d* 216 (App.Div.2002) (quoting *Jimenez v. GNOC, Corp.*, 286 *N.J.Super.* 533, 540, 670 *A.2d* 24 (App.Div.), *certif. denied*, 145 *N.J.* 374, 678 *A.2d* 714 (1996)) ]

The trial judge was entitled to conclude that the Ryan report was not a net opinion because the report sufficiently explained the bases for Ryan's opinions. Ryan related the facts of the case to "generally accepted practices within the law enforcement profession" and to specific sources of those practices, including the

policies and practices of the State Police. We, thus, conclude that the judge did not abuse his discretion in denying plaintiff's motion.

The June 24, 2011 orders granting defendants' motions for summary judgment are reversed. The April 1, 2011 order denying plaintiff's motion to strike the Ryan report is affirmed.

Affirmed in part; reversed and remanded in part.